No. 101,136

STATE OF KANSAS, *Appellant*, v. PAUL R. FINCH, *Appellee*.

(244 P.3d 673)

Opinion filed January 7, 2011.

*Nicole Romine*, assistant district attorney, argued the cause, and *Mark A. Simpson*, assistant district attorney, *Charles E. Branson*, district attorney, and *Steve Six*, attorney general, were on the brief for appellant.

*Janine A. Cox*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This appeal by the State arises on a question reserved in a driving under the influence (DUI) prosecution. The State challenges the district court judge's decision to grant a motion for judgment of acquittal based on the margin of error for the Intoxilyzer 5000 used to test defendant's blood-alcohol concentration.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Paul R. Finch was arrested for DUI, and his blood-alcohol concentration was measured at .08 through the use of an Intoxilyzer 5000 within 2 hours of his operating a vehicle. The State initially charged him in the alternative under K.S.A. 2007 Supp. 8-1567(a)(1), (a)(2), and (a)(3). Immediately before trial, the State informed the court that it was basing its DUI case solely on subsection (a)(2), which reads: "No person shall operate or attempt to operate any vehicle within this state while: . . . the alcohol concentration in the person's blood or breath, as measured within two hours of the time of operating or attempting to operate a vehicle, is .08 or more." See K.S.A. 2009 Supp. 8-1567(a)(2) (same language). At trial, a police officer testified that he conducted two tests on the Intoxilyzer 5000 every 7 days or every 14 tests, whichever came first, to ensure that it was properly calibrated. He further explained that the results from these tests often varied. For example, on April 24, 2007, the first test returned a result of .080; the second test returned a result .079. Two days before, the first test had returned a result of .072; the second test returned a result of .073. The officer said the Intoxilyzer 5000 was calibrated so that tests returned readings from .070 to .089, with a temperature range of 33.8 degrees Celsius to 34.2 degrees Celsius. If the results did not fall within this range, the machine would abort the test and give an error message. The officer also testified that a person with a test result of .08 was considered intoxicated under state law.

"Q. [DEFENSE COUNSEL:] And there is a margin of error in the Intoxilyzer 5000, is there not?

"A. [OFFICER:] I would not agree with that, no."

During further cross-examination by Finch's counsel, the officer was asked if the Intoxilyzer 5000 was 100 percent accurate. This exchange followed:

"Q. Is there not a one percent margin of error on either side?

"A. Not that I am aware of, according to the statistics.

"Q. Not that you are aware?

"A. Not that I have been taught, no.

. . . .

"Q. You don't know whether there is a margin of error from the manufacturer?

"A. I'm stating I was not taught that there was.

"Q. All right. Were you taught that there wasn't?

"A. That's correct. I was taught that the test you get is accurate.

"Q. With—I mean like an election . . . . for instance where you have a two or three percentage point usual margin of error, you're saying that doesn't exist here?

"A. I would agree with that, yes.

"Q. I'm sorry?

"A. I believe that statement would be correct.

"Q. And do you have an explanation then as to why every trial that we pointed out was different, between one test and another, a percentage point or two, like for instance .079 to .080?

. . . .

"A. The simulator solution bottle is attached to the Intoxilyzer. The simulator solution is heated, it has a heater in it. The top is not heated and the breath tube is not heated. When a subject gives a test, that breath tube is heated to try and maintain a constant temperature of the test, so with the simulator top not being heated and the tube not being heated, that air that is pulled through that simulator comes in at room temperature instead of what a person's temperature is, and therefore with that change it's gonna actually change your test result minutely, and that's why the State has a range."

Finch moved for judgment of acquittal after the State rested its case, arguing that the varying test results obtained on the Intoxilyzer 5000 created reasonable doubt. The district judge expressed concern about the officer's testimony, saying:

"Well, first, [the officer's] testimony to me seems inconsistent, and you can explain it if you want, with his testimony that the . . . Kansas Department of Revenue allows a variation between .073 and .087 in the known sample.

. . . .

"And the known sample is . . . what's used to compare the unknown sample, and that's a .014, 14 one-hundredths variation. I don't understand how anything . . . below .087 can be said to be .080 beyond a reasonable doubt, and so you can explain to me how—I mean I think [the officer's] testimony is inconsistent when he says there is no margin of error. Unfortunately, I'm also tainted by the fact I had a chemist testify in a trial . . . that there is in fact that variation in the Intoxilyzer 5000."

The State responded, and then the judge and counsel further discussed the Intoxilyzer 5000:

"[THE STATE]: . . . [The officer] testified that the known sample is, the tubes aren't heated so that it can allow that tolerance, so that it's an accurate test, and that it's different when a person gives a test because the breath is warmed up and what not, and I think he did a good job of explaining that inconsistency between the known sample and then an actual human test. He testified for several minutes over that.

"THE COURT: But they heat the known sample, it's got to be a certain temperature.

"[THE STATE]: Right, but he said there [are] variances in the known sample that can cause that variance, that's not present when they do the human sample, and he testified that there is no margin of error, and I think because we have that testimony in front of the jury there is enough to submit it to the jury for them to make a finding. They can decide if it's—if it hasn't risen to the level of reasonable doubt, or not, beyond a reasonable doubt or not, but I think that we've gotten past this point.

"[DEFENSE COUNSEL]: I think he also testified that every solution tests differently, so again when he was talking about the warm breath, every solution then is going to be a little different, and when it's this close, how in the world can you get to where we need to go.

"THE COURT: I don't think it makes sense, and frankly it's my belief that anything under .087, you cannot say beyond a reasonable doubt that it is—

"[THE STATE]: Those facts may or may not be true, but they're not before this jury and before the Court on this case.

"THE COURT: So we let them decide something that's on incorrect evidence that we know is incorrect?

"[THE STATE]: Well, I think we have to submit the case on the evidence that's been presented in this case, not evidence that's been presented . . . in any other case ever. We don't have any evidence in this case that that's inaccurate or that there is a margin of error.

"THE COURT: Well, yeah, there is evidence, there is evidence—

"[THE STATE]: Not in this case.

"THE COURT:—there is evidence as the known sample—

"[DEFENSE COUNSEL]: Well, there is evidence that every time they tested, it came out different when they're doing the tests back to back.

"THE COURT: Yeah, which is .02.

"[THE STATE]: Well, but [the officer] testified as to why that happens. He did present that testimony as to why that happens with the known sample and not with the human sample.

"[DEFENSE COUNSEL]: Well, because every solution tests differently, which doesn't make a lot of sense.

"[THE STATE]: Every, every solution is different than any other solution.

"THE COURT: I know [the officer] is wrong. I cannot let that go to the jury knowing it's wrong. I am going to grant the motion for directed verdict."

We transferred this appeal on a question reserved on our own initiative.

## DISCUSSION

Kansas courts accept appeals of questions reserved when the issues are " ' "matters of statewide interest important to the correct and uniform administration of the criminal law and the interpretation of statutes" ' but will not consider such appeals when ' "resolution of the question would not provide helpful precedent." ' " *In re C.P.W.*, 289 Kan. 448, 451, 213 P.3d 413 (2009) (quoting *State v. Skolaut*, 286 Kan. 219, 224, 182 P.3d 1231 [2008]).

This case concerns a matter of statewide interest important to the correct and uniform prosecution of countless and often highly contentious DUI cases. Scientifically valid measurement of blood-alcohol concentration is a frequent feature of such cases, and margin of error in testing equipment a potentially fertile field of inquiry for the defense. We thus have no hesitation in concluding that resolution of the issue presented in this case will provide helpful precedent.

This appeal requires that we address questions both legal and factual. We must explore the legal elements the statute requires the State to prove in any K.S.A. 8-1567 (a)(2) prosecution. Then we must examine the evidence presented by the State in this case to decide whether, factually, it met the statutory proof requirements and should have survived the defense motion for judgment of acquittal. Although the outcome on this question in this appeal

will not affect Finch, whose acquittal will stand, it promises to guide participants in future cases.

Two standards of appellate review are relevant.

First, statutory interpretation and construction raise questions of law reviewable de novo. *State v. Jefferson*, 287 Kan. 28, 33, 194 P.3d 557 (2008). The court's first task is to "ascertain the legislature's intent through the statutory language it employs, giving ordinary words their ordinary meaning." *State v. Stallings*, 284 Kan. 741, 742, 163 P.3d 1232 (2007).

"When a statute is plain and unambiguous, we must give effect to its express language, rather than determine what the law should or should not be. We will not speculate on the legislative intent and will not read the statute to add something not readily found in it. If the statute's language is clear, there is no need to resort to statutory construction. [Citations omitted.]" *Graham v. Dokter Trucking Group*, 284 Kan. 547, 554, 161 P.3d 695 (2007).

Second, just as a district court must base its ruling regarding a defendant's motion for judgment of acquittal on the sufficiency of the evidence, an appellate court reviewing a district court's grant or denial of such a motion examines the sufficiency of the evidence to support the conviction. *State v. Cavaness*, 278 Kan. 469, 479, 101 P.3d 717 (2004). " '[T]he [proper] standard . . . is whether, after reviewing all of the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational fact finder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" 278 Kan. at 479.

The parties' arguments also illuminate the legal and factual divide on the question before us. Specifically, the outcome of this case depends upon the correct meaning and appropriate application of the phrase "as measured" in K.S.A. 2007 Supp. 8-1567(a)(2). As set forth above, the statute prohibits operating or attempting to operate a vehicle "while" the alcohol concentration of the driver's blood or breath, "as measured within two hours" of operating or attempting to operate a vehicle, is .08 or more.

The State argues that the district judge's ruling in this case depended upon an improper legal conclusion that, to get to a jury, the State must prove beyond a reasonable doubt a defendant's *actual* blood- or breath-alcohol concentration within 2 hours of

driving, rather than merely a *measurement* of it within 2 hours of driving. See *State v. Fish*, 228 Kan. 204, 207-10, 612 P.2d 180 (1980) ("operating" and, "driving" are synonymous and used interchangeably). Given the judge's understanding of the Intoxilyzer 5000's margin of error, he ruled that the State would have to prove a reading of at least .087, rather than the statutory threshold of .08. At oral argument, counsel for the State went further, arguing that no defendant should be permitted to mount a margin of error defense to a charge under 8-1567(a)(2) once the State demonstrates that (1) the Intoxilyzer was operating properly, (2) the Kansas Department of Health and Environment testing protocol was followed, and (3) the test reading was .08 or more. The State asserts that the historical categorization of 8-1567(a)(2) as a "per se" statute prevents such a defense as a matter of law. It also argues that, factually, its evidence was sufficient to make a prima facie case.

The defense argues that the district judge's ruling on the motion for directed verdict depended entirely on his appropriate assessment that the particular evidence in this case was factually insufficient, rather than any legal ruling regarding "as measured" or the margin of error. In the view of the defense, the district judge took the case from the jury because the State failed to meet its burden to come forward with evidence to support a prima facie case submissible to a jury; the evidence demonstrated that the Intoxilyzer 5000 was unreliable when Finch underwent his test and, thus, the result could not support his conviction as a matter of law, even under a per se statute.

The plain language of K.S.A. 2007 Supp. 8-1567(a)(2) is clear and unambiguous and, at least in part, favors the State. The State is correct that the only elements in this case were: (1) Finch operated/drove a vehicle; (2) while driving, Finch had an alcohol concentration in his blood or breath of .08 or more, as measured within 2 hours of operating/driving; and (3) the driving occurred on the date alleged in Douglas County, Kansas. See K.S.A. 2007 Supp. 8-1567(a)(2); PIK Crim. 3d 70.01-A. The statute does not mention the concept of margin of error. It neither requires its calculation nor prescribes a reduction in the Intoxilyzer test result based upon it.

As our Court of Appeals has previously recognized, a legislature certainly is capable of stating that a margin of error must be considered as a matter of law when drafting a driver's license revocation statute. See *Ruble v. Kansas Dept. of Revenue*, 26 Kan. App. 2d 1, 4-6, 973 P.2d 21 (1997) (discussing *Nugent v. Iowa Dept. of Transp.*, 390 N.W.2d 125, 128 [Iowa 1986], subsequent statutory amendment by Iowa legislature; citing similar decisions in *Wieseler v. Prins*, 167 Ariz. 223, 225-26, 805 P.2d 1044 [Ct. App. 1990], *rev. denied* March 5, 1991; *Hrncir v. Commissioner of Public Safety*, 370 N.W.2d 444, 445 [Minn. App. 1985]). The same is true when a legislature drafts a DUI criminal statute. Our legislature did not do so in 8-1567(a)(2). And, as an appellate court, we are not willing to write a margin of error into its otherwise clear statutory language.

That being said, we also are not willing to go as far as the State would lead us in the opposite direction. The State overeggs the pudding when it discusses the historical categorization of 8-1567(a)(2) as a "per se" statute. See *City of Colby v. Cranston*, 27 Kan. App. 2d 530, 536-37, 7 P.3d 300, *rev. denied* 269 Kan. 931 (2000) (actual alcohol concentration need not be proved); *State v. Hartman*, 26 Kan. App. 2d 928, 931-32, 991 P.2d 911, *rev. denied* 269 Kan. 937 (2000) (not material whether defendant could safely drive vehicle). The State need not prove a defendant's actual blood- or breath-alcohol concentration at the time of the test or at the time of driving, and it need not prove alcohol's actual adverse impact on a defendant's driving; but mere proof of an Intoxilyzer reading of .08 or above within 2 hours of defendant's driving does not automatically necessitate conviction. The inclusion of the "as measured" language in 8-1567(a)(2) since the statute was amended to add it in 1990 does not inoculate the State's proof from defense challenge. See *Hartman*, 26 Kan. App. 2d at 931.

Indeed, the State's argument that a defendant should never be permitted to mount a margin of error defense appears to arise out confusion between the concept of a "per se" statute and the concept of a "prima facie" case. The State's introduction of evidence supporting the statutory elements in a per se criminal statute does not endow the evidence with infallibility. It is sufficient to support

a conviction but not to guarantee it. It merely establishes a prima facie case, one that may prevail "unless disproved or rebutted." Blacks Law Dictionary 1228 (8th ed. 2004); see *Hartman*, 26 Kan. App. 2d at 932; see also *United States v. Madden*, No. 99-3276, 2000 WL 966436, at \*3-4 (10th Cir. 2000) (unpublished opinion).

In short, proof of the elements of a per se criminal statute will get the State past a motion for judgment of acquittal and on to a jury. It will not compel a conviction as a matter of law. The defense may still attack the State's proof and attempt to discredit its witnesses, their machines, and their methods during the State's case-in-chief or later. The jury may finally agree that reasonable doubt prevents a conviction. It is the role of the jury to determine the facts and to apply the law to those facts in reaching its decision. A plea of not guilty places all issues in dispute, including even things most patently true. However strong the State's case may be, the jury has the power to accept it, reject it, or find it insufficiently persuasive. See *State v. Brice*, 276 Kan. 758, 770-71, 80 P.3d 1113 (2003) (quoting *United States v. Mentz*, 840 F.2d 315, 319-20 [6th Cir. 1988]). A defendant in a prosecution under K.S.A. 8-1567(a)(2) may raise and argue margin of error or other questions about the reliability or accuracy of his or her blood- or breath-alcohol concentration "as measured," in the same way he or she can challenge whether the test was conducted within 2 hours of operating or attempting to operate a vehicle. See *State v. Pendleton*, 18 Kan. App. 2d 179, 185-86, 849 P.2d 143 (1993). Margin of error is simply a factor among many possibilities for the fact-finder to consider. See *State v. Miller*, No. 99,460, 2009 WL 1766150, at \*1 (Kan. App. 2009) (unpublished opinion) (margin of error one fact for jury to consider, not dispositive for State, defendant); *City of Hutchinson v. Minor*, No. 90,088, 2003 WL 22831740, at \*2-4 (Kan. App. 2003) (unpublished opinion) (same).

This is exactly the scenario that should have been permitted to play out to its conclusion in this case.

At the conclusion of the prosecution's case-in-chief, when the evidence is viewed in the light most favorable to it, the State had established a prima facie case. Evidence established the elements of the offense under the per se statute, including the measurement

of Finch's blood- or breath-alcohol concentration was .08 or above within 2 hours of his operating a vehicle. We are convinced a rational fact-finder could have found Finch guilty beyond a reasonable doubt. The fact that the defense challenged the reliability and accuracy of the State's evidence, introducing the concept of margin of error and prompting the officer's stubborn insistence that no Intoxilyzer error was possible, made the case one for the jury's evaluation and decision. By granting the motion for judgment of acquittal, the judge erred. The evidence was neither so weak nor so strong that acquittal or conviction was assured as a matter of law. The jury should have been permitted to discharge its duty.

In addition, although neither side makes a point of discussing it on this appeal, we note that the district judge apparently relied in part on testimony he was familiar with from another case. If so, this too was error. See K.S.A. 60-409(a), (b) (circumstances in which judicial notice permitted limited); *State v. McCray*, 267 Kan. 339, Syl. ¶ 7, 979 P.2d 134 (1999) (K.S.A. 60-460(c)(2) permits use of testimony from former trial of same action if declarant unavailable, adverse party had right, opportunity to adequately cross-examine at former trial); *Madden v. Stegman*, 88 Kan. 29, 32, 127 P. 524 (1912) (former testimony may be introduced as evidence in litigation between persons who were parties to earlier litigation in which former testimony given); see also *West v. Reddick, Inc.*, 302 N.C. 201, 202-03, 274 S.E.2d 221 (1981) (court may take judicial notice of its own records in another interrelated proceeding where parties same, issues same, interrelated case referred to in case under consideration); *Gardner v. Martin*, 162 Tex. 156, 158, 345 S.W.2d 274 (1961) (trial court may take judicial notice of its own records in cause involving same subject matter between same, or practically same, parties).

The State's appeal on the question reserved is sustained.

DAVIS, C.J., not participating.