(265 P.3d 1194)
Nos. 102,881
      102,933

WHEATLAND ELECTRIC COOPERATIVE, INC., *Appellee*, v. ADRIAN POLANSKY, SECRETARY, KANSAS DEPARTMENT OF AGRICULTURE, DIVISION OF WATER RESOURCES, *Appellant*.

Opinion filed November 4, 2011.

*Brett W. Berry*, of Kansas Department of Agriculture, and *Adam C. Dees*, legal intern, for appellant.

*Mark A. Rondeau*, of Watkins Calcara, Chartered, of Great Bend, for appellee.

Before McANANY, P.J., LEBEN, J., and MERLIN G. WHEELER, District Judge, assigned.

LEBEN, J.: When Wheatland Electric Cooperative asked the Division of Water Resources to change characteristics of the company's water rights, the Division approved the changes but limited the amount of water that Wheatland could use under the rights. The district court that reviewed the Division's decision remanded the case to the Division to reconsider the rights' consumptive-use limitation, and the Division then initiated abandonment proceedings and terminated the unused portions of those rights. The district court reviewed the Division's actions again, this time finding that the division couldn't partially terminate Wheatland's water rights. Both parties appealed. In addition to refuting Wheatland's claims that the Division couldn't limit the rights' consumptive use, the Division insists that it could declare a partial abandonment of the rights.

The Division is correct that it could limit the rights' consumptive use, but it is wrong that it has the authority to abandon part of a water right. The Kansas Water Appropriation Act specifically allows the Division's chief engineer to place limitations on water-rights changes that are necessary to protect the public's interest. The Division's regulations follow this statutory authority and are therefore valid. But the Act doesn't allow water rights to be partially

abandoned—under the statute's plain language, only total nonuse of water under the right allows abandonment.

FACTUAL AND PROCEDURAL BACKGROUND

In 1954 and 1955, the Kansas Department of Agriculture's Division of Water Resources approved two vested water rights, FI 168 and FI 229, and a water appropriation right, Application 2,342. A vested right is the right to continue the pre-Kansas Water Appropriation Act water use up to the previously used maximum quantity and diversion rate. K.S.A. 82a-701(d); K.S.A. 82a-730. An appropriation right, on the other hand, is acquired by complying with the Kansas Water Appropriation Act's application provisions; when the chief engineer approves the application, he or she establishes the right to divert from a specific water supply a specific quantity of water at a specific diversion rate. K.S.A. 82a-701(f), 82a-705. Water uses include, but are not limited to, domestic, municipal, irrigation, industrial, and recreational. K.S.A. 82a-707(b). In this case, FI 168's original use was irrigation; FI 229's and Application 2,342's original uses were industrial.

In the beginning, the Garden City Company owned all three rights. After the water diverted under FI 229 and Application 2,342 cooled the Garden City Company's power plant, the company used the water for irrigation under FI 168. In 1957, Wheatland Electric Cooperative bought the power plant and all three water rights from the Garden City Company.

In the 1990's, Wheatland decided to transform itself into a water utility to help curb the City of Garden City's inferior water-quality problem: Wheatland would collect water that it diverted under FI 168, treat the water in a reverse-osmosis treatment plant, and then sell the water to the city. Up until this time, despite the 1957 sale, the Garden City Company had still been using FI 168 to irrigate. A dispute arose between the companies, and Wheatland paid the Garden City Company for any interest that the company had in FI 168 and for 74 acres of FI 168's 280-acre place of use, i.e., the tract of land that the water right could be used on. The 280 acres has been subdivided into 44 parcels that have various owners; Wheatland owns four of those parcels, including the 74-acre tract.

To make its water-treatment goal possible, Wheatland needed to change FI 168's use type from irrigation to municipal and the place of use from Wheatland to Garden City. Wheatland applied for these changes in March 2002. At the same time and to further effect its goal, Wheatland applied to change FI 229's place of use and Application 2,342's type of use and place of use.

In August 2002, the Division conducted a hearing at which the parties presented evidence on the rights' historic water usage. The chief engineer approved Wheatland's requested changes, but reduced FI 168's water usage from 840 acre-feet of water a year to 91 acre-feet a year. The Division also limited FI 229's and Application 2,342's water usage.

When Wheatland asked the Secretary of Agriculture to administratively review the Division's decision, the Secretary declined to exercise review. Wheatland then petitioned the Shawnee County District Court to review the Division's decision. The district court examined several specific issues related to the Division's decision, finding that the Division correctly refused to address various contentions from intervening landowners that Wheatland had abandoned FI 168, as the Division had not conducted formal abandonment proceedings under K.S.A. 2009 Supp. 82a-718(a). The district court also found that the record didn't show that Wheatland had voluntarily limited its rights under K.A.R. 5-7-5.

The district court concluded that the Division could limit Wheatland's right when changing the right's use, but that the Division should have calculated the limitation based on the 280-acre place of use, not just the 74-acre parcel that Wheatland owned. In reversing and remanding the Division's order that limited FI 168's consumption, the district court also asked the Division to question whether Wheatland's actions throughout the proceedings showed that it was voluntarily reducing its rights:

"[T]his issue is remanded back to the agency with the direction to reconsider the consumptive use entitlement under FI 168 in light of the order fixing this right on January 27, 1955[,] . . . or to make a finding that Wheatland voluntarily intended to relinquish or reduce a portion of its rights under FI 168 or otherwise intended to effect only a partial change in use under FI 168."

The court affirmed the Division's other orders. Wheatland appealed the district court's order to this court, but we dismissed the appeal as premature because the district court's remand instructions meant that its order wasn't a final, appealable judgment.

The chief engineer interpreted the district court's remand order as requiring the Division to initiate abandonment proceedings; Wheatland objected to the Division's authority to do so when Wheatland had only filed a change application. Nevertheless, the Division conducted an abandonment hearing on June 7, 2006. Those proceedings were stayed while the parties determined whether Wheatland exclusively owned FI 168 or whether the right's ownership was scattered among the separate parcels' various owners. Wheatland brought a quiet title suit in district court to establish its ownership over FI 168; the district court deemed Wheatland FI 168's owner in February 2008.

The Division then completed the abandonment proceedings and issued its order in May 2008. The order relied heavily on the Division's chief engineer's report that showed that at most 84 acres of FI 168's place of use could be irrigated from 1987 to 2002—the rest had been converted to residential and commercial uses. The Division held that Wheatland had abandoned the other 196 nonirrigable acres. The Division concluded a partial abandonment was statutorily allowed, that it didn't need to notify Wheatland of the abandonment, and that the abandonment order complied with the district court's remand instructions.

When the Secretary of Agriculture again declined to review the Division's decision, Wheatland petitioned the Shawnee County District Court to do so. Upon review, the district court disagreed with the Division that K.S.A. 2009 Supp. 82a-718(a) authorizes partial terminations of vested water rights because the Division's interpretation would essentially eliminate a vested right's vested nature. The district court also held that no published administrative regulation gave the Division the power to partially terminate a vested right. The district court set aside the Division's order. Wheatland appealed the district court's first ruling that the Division could limit the water rights' usage, and the Division appealed the court's ruling against its partial-abandonment order.

## Analysis

Kansas courts have a limited ability to review state agency actions. See K.S.A. 77-621(c). The Kansas Judicial Review Act (KJRA) allows this court to decide the issues that the parties have raised in this case: (1) whether the Division's consumptive-use regulations are unconstitutional; (2) whether the Division acted beyond its jurisdiction; (3) whether the Division erroneously interpreted or applied the law; (4) whether the Division failed to follow proper procedures; and (5) whether the Division acted arbitrarily or unreasonably. K.S.A. 77-621(c)(1), (2), (4), (5), (8).

1. *Consumptive-Use Reduction Proceeding*

*The Division's Consumptive-Use Regulations Are Valid.*

Wheatland argues that the consumptive-use regulations that the Division applied to reduce FI 168's water usage exceed the agency's allowable power under the Water Appropriation Act and violate the Act's fundamental notion of "first in time, first in right." Under Wheatland's view, if the water-rights owner proposes to change the use to another approved use, that change must be approved and the Division can't reduce the amount of water that may be consumed under the permit.

The Division responds that the Act protects the pre-1945 beneficial use to which the vested right was actually applied, not any beneficial use to which it could be changed. The Division insists that its consumptive-use regulations, which explicitly allow reducing the amount of water to be used when the Division approves a change-of-use application, serve the Act's purpose of ensuring that the water resources are put to beneficial use and that changes in vested rights don't impinge on other water rights.

The Division is certainly right that it has this authority under administrative regulations it has adopted. K.A.R. 5-5-8(b) provides that "[e]ach approval of a change application shall be conditioned by the chief engineer with the terms, conditions and limitations the chief engineer deems necessary to protect the public interest . . . ." Wheatland contends that this regulation is invalid because it exceeded the Division's statutory authority. We must determine whether the Division did exceed this authority.

First, when an administrative agency is authorized to adopt regulations, those regulations are presumed valid, and the party challenging the regulations has the burden to show that they are invalid. *Barbury v. Duckwall Alco Stores*, 42 Kan. App. 2d 693, Syl. ¶ 1, 215 P.3d 643 (2009). The Kansas Water Appropriation Act gives the chief engineer explicit authority to adopt regulations that will control, conserve, regulate, allot, and distribute the state's water resources. K.S.A. 82a-706a. So, with the explicit authority to adopt regulations, if the adopted regulations are consistent with the underlying statutes and are appropriate and reasonable, they must be upheld. *Barbury*, 42 Kan. App. 2d at 694.

Second, the Kansas Water Appropriation Act explicitly allows the chief engineer to limit vested water rights when the owner applies to change the right. Accordingly, the regulation at issue is consistent with that statute's plain language and must be upheld.

Let's review these statutory provisions. K.S.A. 82a-708b(a) provides that "[a]ny owner of a water right may change the place of use, the point of diversion or the use made of the water, without losing priority of right." (The term "water right" includes both vested and appropriation rights. K.S.A. 82a-701[g].) Once the owner applies for that change, ·the "chief engineer shall approve or reject [it] in accordance with the provisions and procedures prescribed for processing original applications for permission to appropriate water." K.S.A. 82a-708b(a). Not surprisingly, those provisions—also applicable to new applications for water use—give the chief engineer authority to limit the amount of the use.

Specifically, K.S.A. 82a-711(a) provides that if an applicant's proposal "neither impairs a use under an existing water right nor prejudicially and unreasonably affects the public interest, the chief engineer shall approve [it]." But K.S.A. 82a-711(a) also provides that if the proposal "prejudicially and unreasonably affects the public interest," then "the chief engineer shall make an order rejecting such application or requiring its modification to conform to the public interest to the end that the highest public benefit and maximum economical development may result from the use of such water." K.S.A. 82a-712 specifically gives the chief engineer the discretion to "approve an application for a smaller amount of water

than requested" and to "approve an application upon such terms, conditions, and limitations as he or she shall deem necessary for the protection of the public interest."

So once a change application is made, as Wheatland did here, the statute provides that the chief engineer shall act upon it using the same provisions applied to new applications. And those provisions clearly give the chief engineer the authority to approve an application for a smaller amount of water than requested and to otherwise act in the public interest.

Wheatland counters that the Act specifically provides that vested rights not be impaired except for nonuse and adheres to the first-in-time, first-in-right principle. See K.S.A. 82a-703 ("Nothing contained in this act shall impair [a person's] vested right . . . except for nonuse."); K.S.A. 82a-707(c) ("As between persons with appropriation rights, the first in time is first in right."). But a vested right does not confer upon the owner the supreme right to make *any* use of the water; rather, a vested right gives the owner the right to continue the use of the water that actually had been occurring before the Act was enacted, up to a maximum quantity and rate of diversion. See K.S.A. 82a-701(d). When the owner applies to change the right's use, he or she should not automatically be entitled to the same quantity and rate of diversion as with the original use. Different uses demand different quantities of water and return different amounts of water back into the ecosystem. It is reasonable, then, that the new quantity and rate of diversion should depend upon what new use the owner wants to make of the property and how that new use will affect other existing water rights and the public. The Act does not forbid the chief engineer from taking these factors into account, and the provisions we've previously discussed—K.S.A. 82a-708b(a), K.S.A. 82a-711(a), and K.S.A. 82a-712—authorize both the regulation at issue and the actions taken here by the chief engineer to limit consumptive use given Wheatland's change application.

With these considerations in mind, let's look at Wheatland's case more specifically. Wheatland had diverted and consumed significantly less water than FI 168's maximum diversion amount for irrigation use because only a small portion of the right's place of

use—the land still devoted to farming rather than housing developments—could be irrigated. Changing the use from irrigation to municipal use, where the company would treat the water it diverted and sell it to the city, would likely allow Wheatland to divert and use as much water as any permit would allow because the place of use would no longer impose a practical limitation: the city needs lots of high-quality water, while only so much irrigation can be done on a limited acreage. Not only could the increased diversion affect existing appropriation rights, but the public's interest could also be hindered by the increased drain on a shared water resource. The Act allows the chief engineer to consider these real-world concerns.

The Division's consumptive-use regulations follow the Act's statutory authority. If questions are raised about whether the application impairs senior water rights or prejudicially and unreasonably affects the public interest, the regulations require the applicant to submit information to allow consideration of those questions. K.A.R. 5-5-2a(d). The chief engineer must deny any change application that will materially injure senior water-rights holders, K.A.R. 5-5-8(a), and the chief engineer is allowed to place the terms, conditions, and limitations on the application that he or she deems necessary to protect the public interest. K.A.R. 5-5-8(b).

These regulations are reasonable, appropriate, and consistent with the statute. We note that the Kansas Attorney General came to the same conclusion in an opinion issued in 1995. See Att'y Gen. Op. No. 95-92. While not binding, the opinion has some persuasive value. See *McCraw v. City of Merriam,* 271 Kan. 912, Syl. ¶ 2, 26 P.3d 689 (2001). Specifically, the attorney general concluded that the chief engineer's regulations authorizing the reduction of the amount of water that could be used as a condition to the approval of a change-of-use application were within the chief engineer's statutory authority. In the opinion, the attorney general emphasized that these regulations help the chief engineer to carry out his or her obligation to make sure that changing a water right doesn't damage another water right:

"If approval of a change application would substantially increase the gross pumpage under that water right by allowing the right to be pumped to its maximum

quantity every year . . . the consumptive use would also increase and nearby well owners who depend on that same source of water supply would be injured by the change approval."

The attorney general concluded that the chief engineer's authority to limit consumptive use on change applications was a reasonable method of exercising the chief engineer's statutory duties.

We conclude that the Division's consumptive-use regulations are valid and that the chief engineer may limit consumptive use in connection with the approval of a change-of-use application.

*Wheatland Has Not Shown that the Consumptive-Use Regulations Caused an Unconstitutional Taking of Property Without Just Compensation.*

Wheatland next argues that applying the consumptive-use regulations and reducing its allowable water usage amounted to an unconstitutional taking of property without just compensation. The Division replies that the regulations didn't take anything from Wheatland—Wheatland is still allowed to consume the amount of water that its predecessors had previously been consuming.

We first set out the ground rules for consideration of a taking claim. A state's eminent domain powers are not unlimited as private property cannot be taken for public use without just compensation. U.S. Const. Amends. V, XIV; K.S.A. 26-513(a); *Estate of Kirkpatrick v. City of Olathe,* 289 Kan. 554, 558, 215 P.3d 561 (2009). Water rights are property that can be taken. *Durkee v. Bourbon County Comm'rs,* 142 Kan. 690, 694, 51 P.2d 984 (1935). Where a regulation doesn't actually physically invade the property or deny all economically beneficial use of the property, courts weigh the regulation's economic impact on the owner against the regulation's public purpose. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978); *Garrett v. City of Topeka,* 259 Kan. 896, 907-08, 916 P.2d 21 (1996).

We also must consider whether this is the proper proceeding in which to address Wheatland's takings claim. When a property owner believes that his or her property has been taken without just

compensation and the government hasn't initiated a formal eminent domain proceeding, the owner may file an inverse-condemnation suit for the district court to determine whether a taking has occurred and, if so, what compensation is due. *Kirkpatrick*, 289 Kan. at 559-60. Here, Wheatland hasn't filed an inverse-condemnation suit; rather, it is asserting its takings claim as another ground for relief against the Division's unfavorable decision.

Although whether a taking occurred is a question of law over which appellate courts have unlimited review, some factors utilized in making that determination depend on case-specific facts that haven't been developed in this case. See *Garrett*, 259 Kan. at 908. For instance, courts are called upon to consider the regulation's economic impact on the owner, *e.g.*, how the regulation has decreased the property's value, restricted the owner's access to the property, or interfered with the owner's invested expectations. 259 Kan. at 910; *Penn Cent.*, 438 U.S. at 124. Here, Wheatland has offered no evidence to show how the reductions in water usage have decreased its water rights' values or interfered with its investments.

But we do have some information about the public interests that the consumptive-use regulations serve. As discussed above, these regulations ensure that changing a water right doesn't detrimentally impact another water right. Such a purpose is a specific application of the Act's overriding principle that all water in Kansas is dedicated to the public's use and is subject to the state's control and regulation. See K.S.A. 82a-702. The Kansas Supreme Court found that this principle was an appropriate one for the legislature to apply because "[i]ndividuals do not live alone in isolated areas where they, at their will, can assert all of their individual rights without regard to the effect upon others." *State, ex rel., v. Knapp*, 167 Kan. 546, 555, 207 P.2d 440 (1949). The Kansas Supreme Court has also found that the Act itself doesn't violate the Fourteenth Amendment and that its initial application requirements don't deny due process of law. *Williams v. City of Wichita*, 190 Kan. 317, 340, 374 P.2d 578 (1962); *Knapp*, 167 Kan. at 556. Like the Act's other provisions, the consumptive-use regulations are a proper and reasonable exercise of the state's police power to con-

trol water, prevent waste, and conserve the valuable natural resource. See *Williams*, 190 Kan. at 340; *F. Arthur Stone & Sons v. Gibson*, 230 Kan. 224, 233, 630 P.2d 1164 (1981).

Based on the evidence before this court, the state has a great interest in ensuring that the public isn't adversely impacted by changing another water right. Wheatland hasn't shown that the chief engineer's water-usage reduction impacted its rights in such a way as to outweigh the state's great interest and cause an unconstitutional taking.

### *The Division's Conduct Wasn't Otherwise Arbitrary or Unreasonable.*

For its final complaint about the Division's order in the consumptive-use proceedings, Wheatland maintains that the Division acted unreasonably and arbitrarily in several respects. K.S.A. 77-621(c)(8) provides that an agency's action may be set aside if it is "otherwise unreasonable, arbitrary, or capricious." The Kansas Supreme Court has held that an action is unreasonable when it is taken without regard to the benefit or harm to all interested parties or is without foundation in fact, and that an action is arbitrary and capricious if it is unreasonable or lacks any factual basis. *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs*, 256 Kan. 426, 431, 885 P.2d 1233 (1994). Essentially, the test under K.S.A. 77-621(c)(8) determines the reasonableness of the agency's exercise of discretion in reaching its decision based upon the agency's factual findings and the applicable law. See *Sunflower Racing, Inc.*, 256 Kan. at 445. Useful factors that may be considered include whether: (1) the agency relied on factors that the legislature had not intended it to consider; (2) the agency entirely failed to consider an important aspect of the problem; (3) the agency's explanation of its action runs counter to the evidence before it; and (4) whether the agency's explanation is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. See *Motor Vehicle Mfrs. Assn. v. State Farm Mut.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983); Pierce, Shapiro & Verkuil, Administrative Law & Process § 7.5 (5th ed. 2009). Courts must be careful in making this review because the

legislature has given the discretion to make the decision to an agency, not the court.

We begin our analysis with consideration of the specific arguments made by Wheatland. First, it contends that it should not have been required to change Application 2,342's type of use from industrial to municipal and the right's place of use from Wheatland to Garden City. According to Wheatland, the changes were unnecessary because "industrial use" already encompasses water used in steam electric power plants, which is what the reverse-osmosis treatment plant is, and the water will still be used at Wheatland's facility, not by the city. The Division insists that the opposite is true—that a change application was required here because Wheatland was changing the water's use.

Wheatland is correct that the regulations define industrial use to include water used in providing commercial services, such as steam electric power plants, and that Wheatland and its predecessor, the Garden City Company, had been using water under Application 2,342 in their electric power plants. K.A.R. 5-1-1(qq). But requiring Wheatland to change the right's use type to municipal was not arbitrary.

Industrial use contemplates using the water while providing goods or services. Where the good or service is the water itself, the use seems properly characterized as municipal: " 'Municipal use' means the various uses made of water delivered through a common distribution system operated by [a municipality, water district, or] . . . any other similar entity distributing water to other water users for various purposes." K.A.R. 5-1-1(tt). It's certainly not unreasonable to characterize the use as municipal.

Therefore, it was reasonable for the Division to require a change in Application 2,342's use from industrial to municipal when Wheatland was switching from using the water while operating its power plant to treating the water and selling it to the city. This is especially true when Wheatland proposed to also treat water supplied by the city under the city's water rights. Similarly, based on the change to municipal use and the city's involvement with the water-treatment process, it likewise wasn't unreasonable to require Application 2,342's place of use to be changed to the city.

In a related point, Wheatland contends that the Division was arbitrary when its opinion on whether FI 168's use was industrial or irrigation repeatedly changed. We don't find the Division's statements to have been unreasonable or prejudicial. The Division was simply remarking how the original application requested a dual use of FI 168—irrigation and industrial—but that the right was actually approved only for irrigation use. Additionally, the Division made the statement that both uses were considered when determining the right's maximum quantity in a brief opposing Wheatland's petition for judicial review, not in an actual decision by the Division's hearing officer.

Second, Wheatland argues that even if the Division's consumptive-use regulations are valid, the Division used speculative and baseless facts when it applied the regulations in this case. The Division responds that the chief engineer's application of the regulations was lawful and based on information that the parties accepted at the hearing. Wheatland primarily complains that it improperly has the burden to show that it's entitled to the full consumptive use of its water rights and that the only evidence that the chief engineer considered was the Spronk Report—a report that was prepared as an exhibit for an entirely different case involving litigation between Kansas and Colorado about the Arkansas river. But Wheatland itself relied in part on this report in arriving at its proposed figures. And the chief engineer must rely on some data in making its findings; it was not unreasonable for the chief engineer to rely on the Spronk Report.

Third, Wheatland insists that the Division unreasonably disregarded its request to withdraw the change application. The Division maintains that this court cannot address Wheatland's argument because it failed to present it before the hearing officer.

A party cannot raise an issue to a court that hasn't been raised at the administrative level. K.S.A. 77-617; *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 411, 204 P.3d 562 (2009). Here, Wheatland filed its withdrawal motion and served the motion on the Department of Agriculture. But the Division didn't rule on the motion because Wheatland filed its petition for administrative review 4 days later, and the Secretary of Agriculture declined review shortly

thereafter. And Wheatland's petition for administrative review didn't contain allegations that it should be allowed to withdraw its application. On one hand, it's not clear that Wheatland sufficiently raised this issue at the administrative level to pursue it on appeal. On the other hand, the Division and the Secretary of Agriculture effectively denied it by not acting on the request.

But even if we consider the argument properly before us, the company's argument is not well taken. Wheatland sought to withdraw its change application only after the chief engineer had acted upon it. An applicant's rights remain unchanged only if the chief engineer doesn't approve a change application. K.S.A. 82a-708b(a). In this case, the chief engineer approved the application and used his authority to modify Wheatland's requested changes. Although Wheatland insists otherwise, the modification is not a denial of its application such that Wheatland must be allowed to go back to its original rights by withdrawing the change application. Wheatland had the right to petition for review of the chief engineer's decision, K.S.A. 82a-708b(a), and Wheatland took advantage of that right in this case. It was not unreasonable or arbitrary for the Division not to allow Wheatland to withdraw its change application.

Finally, Wheatland complains that the majority of the total reduced water usage erroneously went to the junior appropriation right (Application 2,342) as opposed to the senior vested rights (FI 168 and FI 229). The chief engineer considered the appropriate statutory and regulatory factors in limiting each right's consumptive use: The engineer found that Wheatland's proposed changes would be reasonable, wouldn't impair existing water rights, and wouldn't prejudicially or unreasonably affect the public's interest if the corresponding limitations were applied. See K.S.A. 82a-711(a), 82a-712; K.A.R. 5-5-8. Application 2,342 had the most gross usage, so it's natural that it would end up with the most net usage after the Division's limitations. There's no indication that the Division attempted to subvert the vested rights in favor of the appropriation rights when making its consumptive-use calculations.

We conclude our consideration of whether the Division's ruling was arbitrary by applying the *State Farm* factors we noted earlier. See 463 U.S. at 43. Wheatland has not shown that the Division has

considered factors wholly outside the statutory framework, that it has entirely failed to consider some important aspect of this problem, that its explanation of its action runs counter to the evidence before it, or that its explanation is so implausible that it cannot be considered the reasonable application of agency expertise. In sum, we cannot judge the Division's actions arbitrary on this record.

## 2. Abandonment Proceeding

### K.S.A. 2009 Supp. 82a-718(a) Does Not Allow Water Rights to Be Partially Abandoned.

Wheatland argues that K.S.A. 2009 Supp. 82a-718(a) provides no authority to the Division to declare the partial abandonment of a water right. K.S.A. 2009 Supp. 82a-718(a) provides that "[e]very water right of every kind shall be deemed abandoned and shall terminate when without due and sufficient cause no lawful, beneficial use is henceforth made of water under such right for five successive years." Since this statute gives the requirements for the abandonment of every kind of water right, and water rights include both vested and appropriation rights, see K.S.A. 82a-701(g), either can be abandoned. The question is whether such rights may be partially abandoned through nonuse.

Kansas courts no longer give any deference to an administrative agency's statutory interpretation; as with other statutory interpretation questions, this court has unlimited review. See *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 904, 249 P.3d 434 (2011); *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, Syl. ¶ 3, 232 P.3d 856 (2010). Thus, we give no specific deference to the Division's interpretation of K.S.A. 2009 Supp. 82a-718(a), though we certainly may consider the rationale behind its interpretation. When interpreting statutes, our goal is to determine the legislature's intent through the statute's language by giving ordinary words their ordinary meaning. *State v. Finch*, 291 Kan. 665, Syl. ¶ 2, 244 P.3d 673 (2011).

Giving ordinary words their ordinary meaning answers the interpretation question in this case. Under K.S.A. 2009 Supp. 82a-718(a)'s plain language, a water right is abandoned when the owner uses *no* water under the right for 5 successive years. No means not

any, none at all. See American Heritage Dictionary 1192 (4th ed. 2006). Thus, if the owner uses even just a little water under the right, the prerequisite to abandonment—total nonuse—isn't met. The statute doesn't allow the chief engineer to carve the water rights into "used" and "unused" portions and abandon the unused portions.

Had the legislature wanted to have the statute interpreted so as to allow partial abandonment, it could have said so in plain words. Several other states have done so. See Alaska Stat. § 46.15.140(b) (2010); Ariz. Rev. Stat. Ann. § 45-188.A (2003); Cal. Water Code § 1241 (West 2009); Colo. Rev. Stat. § 37-92-103(2) (2011); Mont. Code Ann. § 3-7-501(4) (2011); N.M. Stat. Ann. § 72-5-28.A (Michie 1978); Okla. Stat. tit. 82, § 105.17.B (2001); Or. Rev. Stat. § 540.610(1) (2009); S.D. Codified Laws Ann. § 46-5-37 (2004); Utah Code Ann. § 73-1-4(2)(a) (1989); Wash. Rev. Code § 90.14.160 (2004); Wyo. Stat. § 41-3-401(f) (2011). We recognize that some courts have found that statutes silent on partial abandonment nevertheless allow the practice. See *United States v. Alpine Land and Reservoir Co.*, 27 F. Supp. 2d 1230, 1237 (D. Nev. 1998); *State v. Hagerman Water Right Owners*, 130 Idaho 727, 735, 947 P.2d 400 (1997). But we cannot square such a reading of the Kansas statute with its plain language.

The Division argues that the liberal-construction provision of K.S.A. 82a-721 should tip the scales in favor of its interpretation. That statute requires that the Act "be construed liberally to effectuate the purposes hereof" and that "the enumeration of specific powers . . . shall not operate to restrict the meaning of any general grant of power" contained in the Act. We do not see how this negates our understanding of the use of the word "no" in the statutory requirement that there be "no lawful beneficial use" under the water right for 5 successive years before a right is deemed abandoned. We have also noted the overriding principle of the Act, set forth in K.S.A. 82a-702, that all water in Kansas is dedicated "to the use of the people of the state," subject, of course, to the control and regulation provided under the Act. Given the clarity of the term chosen by the legislature as a prerequisite to abandonment ("no lawful beneficial use"), if use by the people of the state

is to be stopped via the partial-abandonment theory, the legislature must give specific statutory recognition of that concept.

The importance of this conclusion is underscored by the importance of the issue. If partial abandonment were allowed when a rights holder used less water than a permit allowed, permit holders would be encouraged to use more water—something that seems contrary to the overall goal of water conservation and management. Once again, if such a policy choice is to be made here, it must be done by the legislature given the language in K.S.A. 82a-702.

## CONCLUSION

In sum, the Division does have discretion, under its consumptive-use regulations, to place some limits on the usage made from a water right when its use is changed, but the Division does not have the authority to declare the partial abandonment of a water right. In our case, after the Division's initial application of its consumptive-use regulations, the district court had remanded the case to the Division for reconsideration of Wheatland's consumptive-use entitlement. Instead of following that directive, the Division pursued its partial-abandonment theory, which both the district court and this court have concluded is contrary to Kansas law. We are thus back essentially to the posture the case was in when the district court first remanded it: the Division must reconsider Wheatland's consumptive-use entitlement under its vested right in FI 168. See K.A.R. 5-5-9.

The Division has suggested that this court should affirm the district court's initial decision approving the Division's order but that we should determine the correct new consumptive-use requirement by adopting the rationale of the hearing officer on remand while correcting certain math errors the Division says were made. We decline that invitation. Whatever discretion there is must be exercised in the administrative process, not by an appellate court. We do not perceive that the entry of a final decision in this case at this point is purely a ministerial matter. Instead, the case must again be returned to the Division to carry out the directives of the district court.

Our remand is properly to the district court, not the Division. We affirm the judgment of the district court, which determined that the Division's consumptive-use regulations were valid and that the Division had no authority to declare the partial abandonment of a water right. We remand the case to the district court for further proceedings consistent with this opinion.