NOT DESIGNATED FOR PUBLICATION

No. 121,469

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal of
KANSAS STAR CASINO, L.L.C.,
for the Years 2014 and 2015
in Sumner County, Kansas.

MEMORANDUM OPINION

Appeal from the Board of Tax Appeals. Opinion filed May 21, 2021. Affirmed in part, reversed in part, and remanded with directions.

*David R. Cooper* and *Andrew D. Holder*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellant Sumner County.

*Jarrod C. Kieffer* and *Frank W. Basgall*, of Stinson LLP, of Wichita, for appellee Kansas Star Casino, L.L.C.

Before POWELL, P.J., GREEN and HILL, JJ.

POWELL, J.: This case returns to us after remand to the Board of Tax Appeals (BOTA). The present appeal is another in what has become an annual event and involves a property tax dispute between Sumner County, Kansas (the County), and Kansas Star Casino, L.L.C. (Kansas Star), located in Mulvane, Kansas. The tax years at issue are 2014 and 2015, when BOTA originally assessed the fair market value of Kansas Star's property to be $97,600,000 and $101,500,000, respectively. In separate opinions decided by other panels of this court in 2018, some of BOTA's conclusions were reversed and remanded for further proceedings. See *In re 2014 Equalization Appeal of Kansas Star Casino*, No. 116,421, 2018 WL 2749734 (Kan. App. 2018) (unpublished opinion); *In re*

1

*2015 Equalization Appeal of Kansas Star Casino*, No. 116,782, 2018 WL 3486173 (Kan. App. 2018) (unpublished opinion).

In response to our court's remands, BOTA issued a "Full and Complete Opinion" on June 3, 2019, and addressed the outstanding issues for both the 2014 and 2015 tax years. In that opinion, BOTA determined the fair market value of the property to be $87,861,000 for 2014 and $82,900,000 for 2015.

The County now appeals these valuations, claiming some of the methodologies used by BOTA are unsupported by the record. After a careful review, we agree that BOTA's determination of the estimated profit margin as part of its income valuation approach for calculating the value of Kansas Star's property for the 2014 property tax year liability lacks sufficient explanation to allow for meaningful appellate review, thus requiring a remand. We affirm BOTA in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

The dispute between the County and Kansas Star concerning the value of Kansas Star's property has been ongoing, and challenges to the property's valuation have become a nearly annual event. Various panels of this court have decided disputes between the parties for tax years 2012, 2013, 2014, 2015, 2016, and 2017. See *In re Equalization Appeal of Kansas Star Casino*, 52 Kan. App. 2d 50, 362 P.3d 1109 (2015); *In re Equalization Appeals of Kansas Star Casino*, No. 119,438, 2020 WL 2296977 (Kan. App.) (unpublished opinion), *rev. denied* 312 Kan. 892 (2020); *In re 2013 Equalization Appeal of Kansas Star Casino*, No. 115,587, 2018 WL 2748748 (Kan. App. 2018) (unpublished opinion); *In re 2014 Equalization Appeal of Kansas Star Casino*, 2018 WL 2749734; *In re 2015 Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173; *In re Equalization Appeal of Kansas Star Casino*, No. 116,210, 2017 WL 6062907 (Kan.

2

App. 2017) (unpublished opinion). Sumner County has filed an appeal regarding the 2018 tax year, but that appeal has yet to be set on a docket before our court.

This appeal comes to us after BOTA's decision on remand for tax years 2014 and 2015. BOTA considered both remands at the same time.

As other panels have explained, Kansas Star is one of four state-sponsored gaming enterprises in the State authorized under K.S.A. 74-8733 et seq., the Kansas Expanded Lottery Act (KELA). In 2007, the Kansas Legislature passed KELA, which divided the state into four gaming zones—northeast, south central, southwest, and southeast. KELA authorized the Kansas Lottery to operate a single gaming facility in each zone. K.S.A. 74-8734(a), (d), (h)(19). The south central gaming zone is comprised of Sedgwick County and Sumner County. K.S.A. 74-8702(f). Kansas Star is the gaming facility manager for the south central gaming zone. Peninsula Gaming was the original project developer, but Boyd Gaming subsequently purchased Peninsula Gaming, which included Kansas Star. Kansas Star's casino is located on property it owns in the far northeast corner of Sumner County near the Sedgwick County line, and Kansas Star operates the gaming facility under the name Kansas Star Casino and Arena Events Center.

The property at issue is a 195.5-acre tract of land located in the northeast corner of the County, specifically in Mulvane, Kansas, with a 171,790-square-foot casino, a 6,000-seat multi-purpose arena, a conference center, and an open-air event pavilion containing 183 livestock stalls and a riding area.

*The Arena*

Construction of Kansas Star's facility was fully completed in 2013, with the permanent casino opening in December 2012 and the first event held at the arena in June 2013.

The arena has not proven to be profitable, operating at a $500,000 loss in 2013 and a $575,000 loss in 2014. Kansas Star has concluded that its arena is fundamentally incompatible with the gaming operations and now markets only smaller shows because of the losses sustained when booking full shows. Data shows that gaming revenue decreases during the large events because high-end players are less likely to visit the casino during the events due to full parking lots, long lines, and big crowds. After the planned arena and equine event center proved to be unprofitable, Kansas Star negotiated with the Kansas Lottery to amend its management contract to allow for the funds dedicated to that portion of the project to be shifted away from additional arena investment and toward conference space.

Kansas Star's arena competes in a saturated arena market and is at a competitive disadvantage due to its location. The arena is one of four arenas in the Wichita area, and competing events often stifled ticket sales for events at the arena. While the arena operated at a loss in 2013 and 2014, the losses were less than forecast. Kansas Star invested approximately $20 million in the construction of the arena, conference center, and supporting structures but did not see any significant increase in revenue or earnings before interest, tax, depreciation, and amortization (EBITDA). Kansas Star took the position that had it not been contractually obligated by the management contract and the bid process to build and operate the arena, the arena would not have been built because its absence would maximize the profitability of the casino.

In general, Kansas Star's overall revenue peaked in the summer of 2013 with the "grand opening bump," but then it fell steadily after that, leveling off in 2015.

*Tax Year 2014*

### A.    *The Parties' Positions*

For tax year 2014, the County valued the property at $153.5 million based on an appraisal performed by Richard Jortberg, MAI. Jortberg considered all three approaches to value: sales comparison, cost, and income. Under the income approach, Jortberg found the value of the subject's real property would be $239.5 million. Jortberg concluded: "This is clearly an incorrect conclusion because the value of the subject by the Cost Approach was $153.5 million." In his testimony, Jortberg noted that he did not "like any bit" of his income allocation approach because there is "not a typical marketplace extraction of factors of rates to do allocations." Jortberg explained that if he were evaluating a Hampton Inn—which would have many other similar properties—then it might be appropriate. After reaching value conclusions under the cost approach ($153.5 million) and income allocation approach ($239.5 million), Jortberg concluded that his cost approach analysis was the best indicator of value because it was based on actual costs.

Kansas Star challenged this valuation and claimed the value of the property to be $75 million. Its appraiser, David Lennhoff, MAI, performed a combined sales/income approach to estimate the value of the property. In doing so, Lennhoff calculated the total value of the enterprise and then allocated a percentage of the value to the real property. Lennhoff claimed he "did not want to incorporate the monopoly aspect to [his analysis] because that seems . . . to be potentially inconsistent with the definition of market value in Kansas." Lennhoff applied a profit margin of 20%, derived from his review of profit margins from casinos in competitive markets.

Next, Lennhoff multiplied his EBITDA estimate by a multiplier of 7.5—derived from his review of 10 casino sales—which led to a value for the going concern of $304

million. During cross-examination, Lennhoff acknowledged it was less than half the enterprise value reflected in Kansas Star's actual balance sheets, but he asserted this was represented in an accounting and due to the monopolistic nature of the subject property. After calculating enterprise value, Lennhoff applied an allocation percentage of 25%, and from this estimate he calculated the value of the real estate at $76.5 million, or $76.1 million for just the 134.5-acre parcel with improvements (and excluding the 63.5 acres that Kansas Star asserts is agricultural land). Lennhoff reconciled his value under the cost approach ($71 million) and his value under the income allocation approach valuation ($76.5 million) and ultimately determined the fair market value was $75,450,000.

B.  *BOTA's Decision*

In determining fair market value of Kansas Star's property, BOTA opted to employ the income allocation approach methodology rather than the cost approach. It noted that in tax year 2013, it determined that because of purported deficiencies in both appraisers' methodologies, neither appraisers' cost approach was reliable or persuasive. BOTA did the same for 2014, stating:

> "The Board finds that the challenges and deficiencies in accurately valuing the subject land value and estimating depreciation via the cost approach found by the Board in the prior tax year's appeal are similarly present at instant. The instant record is replete with evidence substantiating the Taxpayer's contention that the addition/opening of the casino had a lower than expected financial impact on the Taxpayer's business. Given these findings, the Board finds here, as in the prior tax year's appeal, that the income approach methodology sponsored by appraisers Jortberg and Lennhoff is the best methodology for an accurate determination of the subject property's fair market value."

Rather than follow the calculations of either of the competing appraisers, BOTA chose to calculate its own value using the income allocation approach methodology. While both appraisers used this methodology, BOTA used its own numerical values

6

rather than accepting the analysis of one appraiser over the other. The general formula used by both appraisers and BOTA to derive fair market value under the income allocation approach was as follows:

- Step 1: (Actual revenue) x (estimated profit margin) = (estimate for EBITDA)
- Step 2: (EBITDA estimate) x (estimate for EBITDA multiplier) = (estimate for value of going concern)
- Step 3: (Estimate for value of going concern) x (estimate for real estate allocation percentage) = (estimate for fair market value).

Under Step 1, BOTA began its income allocation approach analysis with Kansas Star's actual revenue for 2013. BOTA found that the median profit margin from a table in Jortberg's appraisal report was the best evidence of the profit margin. BOTA explained: "The Board finds that utilizing the subject property's reported actual 2013 revenue with a 21% profit margin as supported by the median drawn from publicly traded properties in the Jortberg appraisal yields an EBITDA of $42,600,000 (rounded)."

Under Step 2 of the formula, after estimating EBITDA, BOTA applied an EBITDA multiplier of 7.64 based on median data drawn from transactional data in both appraisals.

Finally, under Step 3, BOTA applied a 30% real estate allocation percentage based on the median figure from a table in Lennhoff's appraisal report as the most appropriate reflection of market allocation. After applying this figure, BOTA concluded that the fair market value of the subject property for tax year 2014 was $97,600,000.

Both parties sought judicial review of BOTA's order before us.

C.    *Our Judicial Review of BOTA's Order*

Before the panel, both parties argued that BOTA erred in adopting its own income allocation approach to value the property because the analysis was unsupported by substantial competent evidence. The panel conducted a robust analysis of all the parties' arguments regarding this issue. See *In re 2014 Equalization Appeal of Kansas Star Casino*, 2018 WL 2749734, at *16-21. Only two of the panel's conclusions are again at issue in this appeal from the remand.

Of import here, the panel first held that BOTA's selection of a 21% profit margin for the income allocation valuation formula was not supported by substantial competent evidence. Specifically, the panel held:

> "The essence of the County's argument is that BOTA seems to have selected figures out of thin air and has provided no explanation for its 21% profit margin. We must agree. BOTA provides little to no explanation for this figure, making it impossible for us to determine whether the figure is supported by substantial competent evidence. Accordingly, BOTA's adoption of a compromise profit margin of 21% is arbitrary and capricious." 2018 WL 2749734, at *20.

Second, and similarly, the panel held that BOTA's selection of a 30% real estate allocation percentage was not supported by substantial competent evidence because such a determination was unsupported by any evidence in the record on appeal.

> "[T]he County argues that BOTA applied a 30% real estate allocation percentage—based on the median figure in a chart in Lennhoff's appraisal—that had no support in the record. The record presented contains no evidence that selecting the median figure from a list of eight transactions (1) comports with USPAP; (2) is a statistically significant or appropriate methodology for determining real estate allocation percentage; or (3) is otherwise persuasive evidence in light of the record as a whole. BOTA's decision to apply

8

a 30% real estate allocation percentage is not supported by substantial evidence and is unreasonable, arbitrary, and capricious." 2018 WL 2749734, at *20.

The panel remanded the case to BOTA with directions "to apply an approach to value that is supported by substantial competent evidence in the record." 2018 WL 2749734, at *21.

D.    *BOTA's Decision on Remand*

On remand, BOTA again utilized the income allocation approach. This time, it selected the following figures:

- Actual revenue:  $202,853,935
- Estimated profit margin:  23.1%
- Estimate for EBITDA multiplier:  7.5
- Estimate for real estate allocation percentage:  25%.

Generally, the parties did not dispute the actual revenue or the estimate for the EBITDA multiplier before BOTA, nor do they on appeal. It is BOTA's rationale for selecting 23.1% as the estimated profit margin and 25% as the estimate for the real estate allocation percentage which is at issue. Using these figures, BOTA appraised the value of the property for tax year 2014 at $87,861,000.

*Tax Year 2015*

A.    *The County's Position*

As with tax year 2014, the County hired Jortberg to appraise Kansas Star's property for tax year 2015, who valued the property at $167 million. Jortberg concluded

the cost approach was the most appropriate methodology. The cost approach has three components: (1) land value; (2) reproduction/replacement costs; and (3) depreciation.

To calculate land value, Jortberg first performed a highest and best use analysis. He concluded the subject property's highest and best use, both as vacant and improved, was for casino entertainment because it was physically possible, legally permissible, financially feasible, and maximally productive to use the property for that purpose. Jortberg ultimately concluded that the $17 million price Kansas Star paid to acquire the real estate tract in Mulvane was the best evidence of its value. Unlike in 2014, Jortberg did not adjust the land value for any market conditions in 2015.

There is an agricultural lease for part of the property, and Jortberg testified that Kansas Star's agricultural lease was not relevant to his land valuation because the predominant use of the subject property was casino gaming, not agriculture. Jortberg determined the entire 195.5 acres, including the mostly unused northwest tract, as necessary and important to Kansas Star because of the property's long-term gaming potential. In addition, much of the unused acreage had been designated as drainage easements, which are also necessary to the property.

For the second step of the cost approach, Jortberg calculated the reproduction/ replacement cost of the property. Starting with actual construction costs then applying an adjustment for inflation of 3% and a 12.5% entrepreneurial incentive to the reproduction cost—which Jortberg explained was appropriate because an entrepreneur would expect to receive a profit over and above its investment costs as incentive for developing the property—Jortberg concluded that reproduction costs were about $155.6 million.

For the final step, Jortberg considered depreciation and applied a 1.11% allowance for physical depreciation. He concluded the functional/economic obsolescence amounted to $3.8 million. In analyzing functional obsolescence, Jortberg explained that functional

obsolescence has two parts. First, he recognized a reduction in value of $3.8 million, derived from items torn out during the arena renovation, architectural fees that were written off, and some demolition. Second, Jortberg determined the arena was not superadequate because (1) it was built by a highly experienced professional gaming company; (2) arenas are a typical amenity for casinos; (3) studies by the developer indicated that the arena would drive visitation to the property and provide a positive economic benefit; and (4) building the arena was a legal requirement of Kansas Star's management contract. Jortberg also concluded there was no economic obsolescence because there was no evidence that the value of the property was negatively affected by external factors.

Jortberg concluded the cost approach analysis was the best indicator of value because it was based on actual costs and appraised the property at $167,000,000.

B.     *Kansas Star's Position*

Kansas Star appealed the County's valuation to BOTA. It retained Bliss Associates' appraisers Robin Marx and Robert Jackson to appraise the subject property. Based on their report, Kansas Star asserted a value of around $76 million.

Jackson valued the subject property using two extraordinary assumptions:  (1) The management contract is in place and will be renewed after its expiration at the conclusion of the initial 15-year term; and (2) the management contract is transferable to a qualified third-party purchaser with no additional "privilege fee." Consistent with these assumptions, Jackson determined that the highest and best use of the subject property was the current use, which is as a "mixed-use gaming and entertainment development."

Like Jortberg, Jackson considered all three approaches to value but reached conclusions only in the cost and income allocation approaches to value. Jackson's cost

11

approach included a land value analysis, replacement cost analysis, and an obsolescence/depreciation analysis. Beginning with land value, Jackson looked at the five available casino-site land transactions in Kansas and valued the 119.8 acres of land at $76,500 per acre, or about $9.1 million.

Jackson then estimated reproduction costs for the property's improvements, using actual construction costs from Kansas Star. Jackson found the relevant construction costs equaled $135.5 million and then adjusted those costs for inflation. For replacement cost new, Jackson used an inflation-adjusted reproduction cost of the improvements to the subject property—$348.90 per square foot or about $146.1 million. Jackson applied a 4% allowance for physical depreciation, noting that the subject property was 2 years old and was estimated to have a 50-year economic life. Jackson concluded that replacement cost new less depreciation of the subject property was $67.3 million.

Jackson performed a combined functional and external obsolescence analysis and concluded that 52% of the real estate is obsolete due to superadequacy. In other words, $72.9 million was applied to account for the requirements of Kansas Star's license to operate the casino. As noted, Kansas Star was required to have the convention center, arena, and pavilion as part of its management contract. In addition, the net operating income declined from levels achieved during the grand opening. Jackson extracted the real estate costs that were not supportive of value and deducted them as obsolescence. Jackson explained there was a misconception that a property built by experienced developers would not have functional obsolescence soon after it is built, but "[p]eople do make mistakes in every industry, and the gaming industry is no different." In this case, Jackson believed that Kansas Star's ancillary facilities were fully obsolete because they had not generated revenue sufficient to justify their construction. Jackson determined that a 52.2% deduction for functional and external obsolescence was appropriate.

After combining the land value and reproduction costs, less depreciation, Jackson deducted an additional $497,839 in costs associated with the equine facility, which was not yet complete as of the valuation date. Under the cost approach, Jackson concluded the value of Kansas Star's property was $76 million.

C.    *BOTA's Decision*

Despite applying the income approach in 2013 and 2014, BOTA applied the cost approach in 2015 to calculate the property's valuation.

BOTA first resolved the parties' dispute regarding the classification of the real estate, finding the 63.5 acres of leased land should be classified as agricultural property. Regarding the land value of the remaining commercial acreage, BOTA acknowledged that Kansas Star paid approximately $87,000 per acre in 2011, but it adopted Kansas Star's expert's per acre figure of $76,500, finding Jackson's figure to be more persuasive. Applying the $76,500 per acre figure to the 132 acres classified as commercial resulted in a land value of $10.1 million.

In comparing the two appraisals, BOTA found that "Jackson's appraisal for [Kansas Star] carries more weight than Mr. Jortberg's appraisal done for the County." In rejecting Jortberg's entrepreneurial profit adjustment, BOTA noted:

> "[T]he evidence does not show that if it were appropriate to include [an adjustment for entrepreneurial profit] in the first place, 12½% would be the proper figure. In this case, due to the circumstances of the subject property being a build-to-suit, owner-occupied property, any development costs are a part of the business rather than the real estate."

BOTA also adopted Jackson's physical depreciation figure of 4%, finding that it "better accounts for the age of the subject property and its economic life."

13

In estimating functional and economic obsolescence, BOTA was presented with two strikingly contrasting views. The County asserted the ancillary facilities suffered from no obsolescence, but Kansas Star claimed the facilities were fully obsolete.

BOTA rejected both of the experts' obsolescence opinions, stating:

> "The evidence shows that the arena, convention center, and equine center do not contribute to the overall profit of the subject property. In fact, they detract from it. Therefore, some allowance should be given to account for this economic obsolescence. Mr. Jackson's report indicated that the arena was over built by two thirds; consequently, the 52% economic obsolescence figure used by Mr. Jackson, should be reduced by a third to 35%."

After accounting for depreciation, BOTA concluded the fair market value of the commercial portion of the subject property was $101,500,000 as of January 1, 2015.

Both parties sought judicial review of BOTA's decision.

D.     *Our Judicial Review of BOTA's Decision*

In our court's prior opinion for tax year 2015, the panel ultimately affirmed "BOTA's order in almost all respects, except as to the parties' claims regarding depreciation and functional obsolescence, particularly as it relates to superadequacy." *In re 2015 Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at *22.

The prior panel held that BOTA's conclusion that the arena was two-thirds overbuilt was not supported by the evidence and that BOTA's methodology of comparing Kansas Star's seats-per-gaming position to casino/arena gaming enterprises in competitive markets was not an appropriate method for measuring depreciation. The

14

panel held that BOTA's analysis did not comply with approved appraisal practices. 2018 WL 3486173, at *13-16.

Specifically, the panel held:

"BOTA's conclusion that the arena was two-thirds overbuilt is not supported by the evidence. The Bliss appraisal concluded that the arena was 100% obsolete because it contributed no value to the overall property. But BOTA referred to 'Mr. Jackson's report' in concluding that the arena was overbuilt by two-thirds. Neither party disputes that this was an error in fact. The only evidence that the arena was two-thirds overbuilt was from Morowitz, who stated in his report that the size of the Kansas Star Arena 'is inappropriate relative to its casino and hotel operations' and 'as much as two-thirds of the arena's capacity may not be needed or is functionally obsolete.' As explained by Kansas Star, this was only the first step Morowitz took in his analysis, not his final conclusion.

"More important than the factual error, there was no evidence that BOTA's methodology of comparing Kansas Star's seats-per-gaming position to casino/arena gaming enterprises in competitive markets was an appropriate method for measuring depreciation. In calculating depreciation for functional obsolescence, the Appraisal Institute provides a five-step formula: (1) identify the cost of the existing item; (2) deduct depreciation previously charged; (3) if functional obsolescence is curable, add up all of the costs associated with curing the item, and if incurable, add value of the loss; (4) if curable, subtract cost of the proper item if included in new construction, and if incurable, subtract depreciated cost of the proper item if included in new construction; (5) add up all the entries to derive the total functional obsolescence attributable to each factor. The Appraisal of Real Estate, Appraisal Institute, 627 (14th ed. 2013). Both parties presented competing evidence about calculating depreciation. Morowitz' stand-alone option that the arena was two-thirds overbuilt is a fact that appears in the record, but merely reducing the economic obsolescence figure by one-third is not an accepted method of calculating functional obsolescence. BOTA's decision to rely on a single data point in its calculations ignores the record as a whole and does not comply with approved appraisal practices.

15

"BOTA's conclusion that Jackson's 52% economic obsolescence figure should be reduced by one-third is not supported by evidence that is substantial when considering the record as a whole. Further, BOTA misapplied the law when it failed to comply with USPAP in calculating functional obsolescence. Because of these errors, BOTA's decision was unreasonable, arbitrary, and capricious and must be reversed. The parties provide extensive support for their competing positions in their briefs and ask us to adopt their position on functional obsolescence; however, it is not our role to calculate functional obsolescence. Rather, remand to BOTA for further proceedings is appropriate. Given the opposite conclusions each side advocates and BOTA's attempt to choose a middle ground, we emphasize that our holding does not compel BOTA to adopt one of the party's positions and that a figure somewhere in between 100 percent and 0 percent might be supported by the record in this case. On remand, BOTA would have to explain its rationale for supporting a figure in between the parties' positions; it would have to point to evidence in the record supporting its figure; and its rationale would have to be USPAP compliant." 2018 WL 3486173, at *15-16.

### E.    *BOTA's Decision on Remand*

On remand, the parties again took "diametrically opposite positions regarding the superadequacy of the casino's nongaming ancillary facilities." Kansas Star argued the ancillary facilities were functionally and economically obsolete, while the County argued the property suffered from no obsolescence because having the nongaming ancillary facilities was the only legally permissible use of the property as they were constructed specifically to comply with KELA.

BOTA examined KELA and held it lacks an arena requirement for the operation of a casino in Kansas. BOTA explained that while an arena may have been a requirement of Kansas Star's management contract, an arena was not a requirement of KELA itself:

"Examination of KELA does not indicate that an arena is specifically required for the operation of a casino in Kansas. KELA authorizes the Kansas Lottery Commission to

16

approve a management contract with a prospective lottery gaming facility manager to manage a 'lottery gaming facility' or 'lottery gaming enterprise.' K.S.A. 74-8734(e). KELA defines a 'lottery gaming facility' as just a casino, whereas a 'lottery gaming enterprise' is a casino and ancillary lottery gaming facility operations. K.S.A 74-8702(m) and 74-8702(l). KELA defines 'ancillary lottery gaming facility operations as 'additional non-lottery facility game products and services . . . which may be included in the overall development . . . [that] may include, but are not limited to, restaurants, hotels, motels, museums or entertainment facilities.' The subject property currently contains multiple restaurants and bars, as well as being attached to a separately owned hotel. Therefore, the subject property, both with or without the arena, satisfies the KELA requirements of either a 'lottery gaming facility' or 'lottery gaming enterprise.' As such, while the arena is a requirement of Kansas Star's management contract, the arena is neither a statutory requirement of KELA, nor a specific requirement for obtaining a management contract."

Further, BOTA found that the County improperly equated Kansas Star's contractual obligations under its management contract with "legal obligations" or "land use restrictions" for the purpose of determining fee simple real estate value for Kansas ad valorem tax purposes. BOTA held:

"The Board, further, finds that the County improperly equates Kansas Star's contractual obligations via the management contract with 'legal obligations' or 'land use restrictions' for purposes of determining fee simple real estate value for Kansas ad valorem taxation purposes. The Board finds this argument inconsistent with Kansas law. Kansas law is very clear that personal contractual obligations, such as leases, are not part of the fee simple interest in real estate to be valued for ad valorem tax purposes. See *In re Prieb Properties, L.L.C.*, 47 Kan. App. 2d at 131 (holding, in the context of sale leaseback agreements '[i]t is clear, therefore, that the fair market value statute values property rights, not contract rights'). Moreover, KELA explicitly provides that the management contract is not a land-use restriction as it 'shall not constitute property, nor shall it be subject to attachment, garnishment or execution, nor shall it be alienable or transferable, except upon approval by the executive director, nor shall it be subject to being encumbered or hypothecated.' K.S.A. 74-8734(m)."

17

Finally, BOTA concluded, as it did in its previous opinion, that Kansas Star's ancillary facilities suffer from substantial functional and external obsolescence. BOTA discredited the County's argument that Kansas Star's current use is its only legally permissible use and adopted Kansas Star's obsolescence determination because it was "the best indicator of value." BOTA then adopted Jackson's valuation and appraised the value at $82,900,000. This figure is almost $7 million more than Jackson originally appraised the property because on remand BOTA corrected a mathematical error in the calculation. Specifically, BOTA held:

> "While the subject ancillary facilities were constructed to comply with the management contract and KELA, the Board has not been persuaded that the subject property, as currently comprised, is the only legally permissible configuration of the property as argued by the County. As such, the County's argument that the existing ancillary improvements are legally required and, therefore, the subject property suffers from no functional or external obsolescence is not supported. Moreover, the Board finds now, as in our original decision on these matters, that the substantial credible evidence indicates that the ancillary facilities suffer from substantial functional and external obsolescence. Based thereon, the Board finds that the cost approach analysis and functional/external obsolescence determination sponsored by the Taxpayer's expert is the best indicator of value. Therefore, the subject property's 2015 appraised value is $82,900,000 as recommended by the Taxpayer at the remand hearing."

The County once again seeks judicial review of BOTA's order.

ANALYSIS

The County takes issue with BOTA's decision on remand for both tax years 2014 and 2015. For 2014, the County argues that BOTA relied on unsupported evidence for two components of the income allocation approach—profit margin and real estate allocation percentage—when it determined the fair market value. For 2015, the County

18

argues that BOTA's depreciation allocation analysis does not comport with appraisal practices, is unsupported by substantial evidence, and is arbitrary and capricious.

*Standards of Review*

The County's arguments for tax years 2014 and 2015 are analyzed under the same standard of review.

"BOTA is the paramount taxing authority in this state. BOTA is a specialized agency that exists to decide taxation issues. Its decisions are given great weight and deference when it is acting in its area of expertise." *In re Appeal of ANR Pipeline Co.*, 276 Kan. 702, Syl. ¶ 2, 79 P.3d 751 (2003). We review BOTA's decision in the manner prescribed by K.S.A. 77-601 et seq., the Kansas Judicial Review Act (KJRA).

The KJRA defines the scope of judicial review of state agency actions, and BOTA orders are subject to KJRA review. K.S.A. 77-603(a); K.S.A. 74-2426(c); *Ryser v. Kansas Bd. of Healing Arts*, 295 Kan. 452, 458, 284 P.3d 337 (2012). Before BOTA, a county, as the taxing party, bears the burden of proof; however, on appeal, the burden of proving the invalidity of BOTA's actions is on the party asserting the invalidity. K.S.A. 79-1609; K.S.A. 77-621(a)(1); *In re Equalization Appeal of Wagner*, 304 Kan. 587, 597, 372 P.3d 1226 (2016).

Tax statutes are construed strictly in favor of the taxpayer. *In re Tax Appeal of Harbour Brothers Constr. Co.*, 256 Kan. 216, 223, 883 P.2d 1194 (1994); *In re Tax Protest of Jones*, 52 Kan. App. 2d 393, 396, 367 P.3d 306 (2016). Interpretation of a statute is a question of law over which we exercise unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009). No deference is given to the agency's interpretation of a Kansas statute, including BOTA's interpretation of any tax statute. See *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013); *Ft.*

*Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs.*, 290 Kan. 446, Syl. ¶ 2, 228 P.3d 403 (2010); *In re Tax Exemption Application of Kouri Place*, 44 Kan. App. 2d 467, 472, 239 P.3d 96 (2010).

K.S.A. 77-621(c) sets out eight standards under which a court shall grant relief. In this case, the County relies on two of those standards, arguing BOTA's decision is not supported by substantial evidence and BOTA's decision is unreasonable, arbitrary, or capricious. See K.S.A. 77-621(c)(7), (8).

K.S.A. 77-621(c)(7) requires a court to grant relief if "the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 77-621(d) defines "in light of the record as a whole" to include the evidence both supporting and detracting from an agency's finding. A reviewing court must determine whether the evidence supporting an agency's factual findings is substantial when considered in light of all the evidence but does not reweigh evidence or engage in de novo review. K.S.A. 77-621(d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 183-84, 239 P.3d 66 (2010). "Substantial competent evidence possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined." *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 709, 216 P.3d 170 (2009).

K.S.A. 77-621(c)(8) requires a court to grant relief if BOTA's "action is otherwise unreasonable, arbitrary or capricious." A presumption of validity attaches to administrative agency actions, and the burden of rebutting that presumption is on the party challenging the agency's action to show the agency's action was arbitrary and capricious. *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d 329, 333, 102 P.3d 1176 (2004).

The test for finding arbitrary and capricious conduct is determining "'whether [a] particular action should have been taken or is justified,'" such as the reasonableness of an agency's exercise of discretion in reaching a determination or whether the agency's action was without foundation in fact. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010); *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 365, 770 P.2d 423 (1989). "Flipping a coin, for example, would be incompatible with weighing of evidence or drawing conclusions necessary to support [the] decision. That would be true without regard to the soundness of the outcome, and a court would act within its authority to vacate the result as arbitrary." *Rural Water Dist. #2 v. Miami County Board of Comm'rs*, No. 105,632, 2012 WL 309165, at *10 (Kan. App. 2012) (unpublished opinion) (Atcheson, J., dissenting). Orders that are unreasonable or without foundation in fact are arbitrary and capricious. *Citizens Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 47 Kan. App. 2d 1112, 1124, 284 P.3d 348 (2012).

Attacks on an agency's decision under K.S.A. 77-621(c)(7) and (8) are different in nature. As explained by another panel of this court, an attack under K.S.A. 77-621(c)(7) takes issue with the agency's fact-finding, whereas an attack under K.S.A. 77-621(c)(8) takes issue with the quality of the agency's reasoning:

> "These tests mean different things. A challenge under K.S.A. 2010 Supp. 77-621(c)(8) attacks the quality of the agency's reasoning. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010) (stating that agency may have acted arbitrarily when it fails to properly consider factors courts require it to consider to guide its discretionary decision); *Wheatland Electric Cooperative*, 46 Kan. App. 2d 746, Syl. ¶ 5, 265 P.3d 1194 (providing factors to consider when determining whether agency acted within its discretion); Gellhorn & Levin, Administrative Law and Process in a Nutshell, p. 103 (5th ed. 2006) ('[T]he emphasis in arbitrariness review [is on] the *quality of an agency's reasoning*.'). Although review must give proper deference to the agency, its conclusion may be set aside—even if supported by substantial evidence—if based on faulty reasoning. A challenge under K.S.A. 2010 Supp. 77-621(c)(7) attacks the quality of the agency's fact-finding, and the agency's conclusion may be set aside if it is based on

21

factual findings that are not supported by substantial evidence." *In re Protests of Oakhill Land Co.*, 46 Kan. App. 2d 1105, 1115, 269 P.3d 876 (2012).

"[A]n agency is not required to furnish detailed reasons for its decision; however, the decision must be sufficiently clear so that a court is not required to speculate as to its basis." *Water District No. 1 v. Kansas Water Authority*, 19 Kan. App. 2d 236, 242, 866 P.2d 1076 (1994). "The decision of any administrative body should contain a finding of the pertinent facts on which it is based in order for the reviewing court to determine whether the decision reached is reasonable and lawful." *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d 881, 888, 221 P.3d 598 (2009). While a degree of clarity is required in agency fact-finding and rationale, Kansas courts

> "have consistently affirmed agency determinations which are conceptually sound but lack some mathematical precision. Our appellate courts have consistently stated that to find a lack of substantial evidence to support the BOTA action, the decision must be so wide of the mark as to be outside the realm of fair debate." *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d at 889 (citing *In re Tax Appeal of Horizon Tele-Communications, Inc.,* 241 Kan. 193, 203, 734 P.2d 1168 [1987]).

See *In re Tax Refund Application of Affiliated Property Services, Inc.*, 19 Kan. App. 2d 247, 250, 870 P.2d 1343 (1993).

*General concepts of ad valorem taxation*

All real and tangible personal property in Kansas is subject to taxation on a uniform and equal basis unless specifically exempted. Kan. Const. art. 11, § 1(a); K.S.A. 79-101. The Kansas Legislature has enacted a statutory scheme to ensure property is appraised for ad valorem tax purposes in a uniform and equal manner. Central to this statutory scheme is the requirement that property be appraised at fair market value as of January 1 of each taxable year, unless otherwise specified by law. K.S.A. 79-1455.

When determining ad valorem valuation, Kansas law requires valuation of the fee simple interest, which is defined as "'[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.' The Appraisal of Real Estate, p. 114 (13th ed. 2008)." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 130, 275 P.3d 56 (2012); see *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d 329, 336-40, 102 P.3d 1176 (2004) (holding Kansas ad valorem valuation contemplates valuation of fee simple interest). In other words, ownership of the fee simple interest is equivalent to ownership of all the property rights associated with the subject property that can be privately owned. *Prieb Properties*, 47 Kan. App. 2d at 130.

"Kansas tax statutes do not use the term 'fee simple'; however, it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property as if in fee simple, requiring property appraisal to use market rents instead of contract rents if the rates are not equal. K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value. In turn, K.S.A. 2010 Supp. 79-503a defines 'fair market value' as 'the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting *for property* in an *open and competitive market*, assuming that the parties are acting without undue compulsion.' (Emphasis added.) It is clear, therefore, that the fair market value statute values *property* rights, not *contract* rights." 47 Kan. App. 2d at 130-31.

The concept that Kansas law requires valuation of the fee simple interest is consistent with K.S.A. 79-102, which states: "[T]he terms 'real property,' 'real estate,' and 'land,' when used in this act, except as otherwise specifically provided, shall include not only the land itself, but all buildings, fixtures, improvements, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto." This definition requires that all rights and privileges in real property are to be valued. However, "[f]or

23

purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." 47 Kan. App. 2d 122, Syl. ¶ 6.

In determining the ad valorem valuation, Kansas law assumes the hypothetical condition of an assumed sale as of January 1 of the applicable tax year. K.S.A. 79-1455 states: "Each year all taxable and exempt real and tangible personal property shall be appraised by the county appraiser at its fair market value as of January 1 in accordance with K.S.A. 79-503a." As such, Kansas' statutory scheme "is a surrogate for a real marketplace event." *Hixon v. Lario Enterprises, Inc.*, 19 Kan. App. 2d 643, 646-47, 875 P.2d 297 (1994), *aff'd as modified* 257 Kan. 377, 892 P.2d 507 (1995). In effect, the parties must pretend "that each piece of property is sold on January 1 of the year in which the appraisal is done in an arm's length transaction." 19 Kan. App. 2d at 647. This imagined transaction is often referred to as a hypothetical sale of the subject property.

Key to determining a value for this hypothetical sale is fair market value. K.S.A. 79-503a provides:

"'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. In the determination of fair market value of any real property which is subject to any special assessment, such value shall not be determined by adding the present value of the special assessment to the sales price."

K.S.A. 79-503a further provides guidance on the methods that may be used to determine fair market value:

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

24

"(a) The proper classification of lands and improvements;

"(b) the size thereof;

"(c) the effect of location on value;

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

"(e) cost of reproduction of improvements;

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

"(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

"(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes."

The list of factors in K.S.A. 79-503a is nonexclusive.

Fee simple interest is also to be considered in determining hypothetical conditions under which a January 1 sale would take place. The fee simple interest of real estate consists of every stick in the bundle of rights. The hypothetical sale must include only the sticks in the bundle of rights and may not include intangible interests or enterprise value. See K.S.A. 79-102 (stating only tangible property taxable); *In re Tax Protest of Strayer*, 239 Kan. 136, 142, 716 P.2d 588 (1986) (intangible property interests not taxable for property tax purposes).

Appraisals for ad valorem taxation purposes must be performed in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP). K.S.A. 79-506(a). In addition, the ad valorem appraisal process must "conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 79-503a.

With these standards in mind, we turn to the County's arguments on appeal.

I.    IS BOTA'S VALUATION USING THE INCOME ALLOCATION APPROACH ON REMAND FOR TAX YEAR 2014 CORRECT?

To refresh, there are four figures utilized to calculate fair market value under the income allocation approach:  (1) actual revenue; (2) estimated profit margin; (3) estimate for EBITDA multiplier; and (4) estimate for real estate allocation percentage. The County takes issue with two of these figures:  the estimated profit margin and the estimate for real estate allocation percentage. It argues that these figures are unsupported by

26

substantial competent evidence. Kansas Star responds these two figures are drawn from evidence in the record and before BOTA, and, therefore, they are sufficient.

A.    *The Profit Margin Figure*

First, the County argues that the profit margin figure selected by BOTA—23.1%—is not supported by substantial competent evidence. Specifically, the County argues that this number was pulled out of "thin air" without an explanation as to why 23.1% was the "best indicator of profit margin for the subject property."

Regarding the profit margin figure, BOTA held the following:

"In regard to profit margin, [Jortberg] determined a profit margin of 37.5%. [Jortberg] submitted that the subject property had an actual profit margin of 39% to 45% of gross revenues for the period at issue. [Jortberg] reviewed data from Macomber International, Inc., who was retained by the Kansas Lottery Review Board during the bidding and proposal phases for the subject casino that indicated estimated profit margins for casino developments at 26% and 37%. Further, [Jortberg] reviewed figures from the Colorado Gaming Commission indicating the largest casino in Colorado had a 18.7% profit margin in a highly competitive gaming environment. Lastly, [Jortberg] reviewed the profit margins of seven publicly traded gaming corporations, which reported an average profit margin of 23.1%. County Exhibit # 555, p. 85.

"Lennhoff reviewed three indicators to conclude a profit margin of 20%:  IBIS World market research indicated an industry average profit market for hotel-casinos of 18.8% and non-hotel casinos of 22.6%, as well as a survey indicating an average profit margin of large gaming companies of 9.6%. After review of this disparate data, the Board finds the profit margin indicated from [Jortberg's] review of seven publicly trading gaming corporations is the best indicator of profit margin for the subject property. This data indicated an average profit margin of 23.1% for seven publicly traded gaming corporations, with four of the seven corporations having profit margins ranging between 18.9% and 25.3%."

The County argues this ruling was erroneous in three ways. First, it argues that BOTA should have used Kansas Star's actual 2013 EBITDA margin of 37.5% rather than the market-derived EBITDA margin of 23.1%. Kansas Star responds that using the actual 2013 EBITDA margin would create an "apples-to-oranges comparison" because the profit margin and real estate allocation percentage need to be considered together, and Kansas Star's higher proportion of intangible value relative to its real estate value is accounted for and removed when utilizing a market-typical EBITDA rather than actual EBITDA. Kansas Star elaborates on this argument in great detail, explaining the interrelation of these two figures and why it is appropriate to consider them together. Additionally, Kansas Star argues that its 2013 EBITDA had not yet stabilized and, thus, it could not accurately be used to determine fair market value of the real estate.

Second, the County argues that BOTA should not have relied on evidence that neither appraiser expressly relied on. Kansas Star retorts that the table relied on was in the record and BOTA credited it over other evidence, which was in BOTA's discretion as the fact-finder.

Third, the County argues that BOTA took inconsistent approaches between the case at hand and the valuation of another case regarding Hollywood Casino in Wyandotte County, Kansas. In that case, Lennhoff appraised the Hollywood Casino using the same income allocation methodologies as the present case. Lennhoff derived the profit margin of 20% by "relying on information concerning broad averages of national and international casino operators." *In re Equalization Appeal of Kansas Entertainment*, No. 117,406, 2018 WL 6713975, at *3 (Kan. App. 2018) (unpublished opinion).

BOTA adopted Lennhoff's methodology but rejected Lennhoff's profit margin (as well as the revenue projection) and instead adopted its own calculation of a 30% profit margin. In its order, BOTA was specific and explained that it based its number on actual and forecasted EBITDA multipliers for the Hollywood Casino because it found

28

Lennhoff's proposed figure to be too low because it was not consistent with the casino's actual performance.

A panel of this court upheld BOTA's decision, holding that BOTA's reasoning for the adoption of its own figures was clear and the modification was supported by substantial competent evidence in the record. 2018 WL 6713975, at *8-9.

"BOTA is the paramount taxing authority in this state. . . . Its decisions are given great weight and deference when it is acting in its area of expertise." *In re Appeal of ANR Pipeline Co.*, 276 Kan. 702, Syl. ¶ 2. BOTA is not required to render the explanation for its findings in detail, so long as the explanation is "specific enough to allow judicial review of the reasonableness of the order." *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 475, 749 P.2d 21 (1988). Under K.S.A. 77-621, we "review the agency's explanation as to why the evidence supports its findings." *Rhodenbaugh v. Kansas Employment Sec. Bd. of Review*, 52 Kan. App. 2d 621, 631, 372 P.3d 1252 (2016). The decision must be sufficiently clear so that we are "not required to speculate as to its basis." *Water District No. 1*, 19 Kan. App. 2d at 242.

Here, BOTA provided no explanation as to why it elected to average the data from the publicly traded gaming companies—the raw data presented in Jortberg's report—other than it was "the best indicator of profit margin for the subject property." Under K.S.A. 77-621, we must "review the agency's explanation as to why the evidence supports its findings." *Rhodenbaugh*, 52 Kan. App. 2d at 631. However, BOTA gives us no explanation as to why the average figure amounting a 23.1% profit margin is best. Without such an explanation from BOTA, our review is impossible.

It is significant that BOTA also used this table in its first decision, but there it used the *median* of the table, not the *average*. See Black's Law Dictionary 1175 (11th ed. 2019) (defining "median" as "[l]ocated in or related to the precise midpoint in a range of

29

values or quantities, such that half of them fall above the midpoint and half below"). After this court's remand, BOTA used the average of the table, finding it the best indicator of profit margin. We have no explanation why the average is to be preferred over the median.

It is important to note we are not criticizing the use of the data in Jortberg's report, as the County argues another panel of this court forbade its use in a prior opinion. BOTA is permitted to look at all the evidence before it and perform its own credibility determination of that evidence, including that provided in the appraisers' reports. See *Redd*, 291 Kan. at 183-84. Moreover, our holding is not a rebuke of BOTA calculating its own figure from evidence it finds most credible in the record before it. Such modifications of the presented figures are permitted. See *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d at 891-92 (upholding BOTA's adjustment for freezer space/cooler space not accounted for in appraisal); *Chowning v. Cannon Valley Woodwork, Inc.*, 32 Kan. App. 2d 982, 987, 93 P.3d 1210 (2004) (holding appellate courts uphold findings supported by substantial evidence even though evidence in record supports contrary findings); *In re Equalization Appeal of Kansas Entertainment*, 2018 WL 6713975, at *8-9 (upholding BOTA's adjustment of profit margin for its own calculation based on substantial competent evidence).

The panel's discussion in the case of *In re Equalization Appeal of Kansas Entertainment*, 2018 WL 6713975, is helpful. There, BOTA adopted its own profit margin figure, but it provided an explanation as to why its selected figure was the best. Here, we are left with no explanation. While several assumptions can be made here as to why BOTA determined its selected figure was the best, we are not permitted to make such assumptions. See *Water District No. 1*, 19 Kan. App. 2d at 242. The lack of explanation for BOTA's finding of 23.1% profit margin to be the best figure impedes our ability to review the reasonableness of the order.

Our conclusion does not mean that 23.1% is not the best figure—it very well may be. We simply cannot determine if the figure is properly supported because there is no indication precisely why it was selected. While there is a discussion of the evidence presented in BOTA's decision on remand, there is no indication as to why BOTA believes the average profit margin of seven large, publicly traded gaming companies is the best profit margin for this casino. Thus, we cannot affirm BOTA's 23.1% profit margin figure, and we remand this issue to BOTA for an adequate explanation of why it adopted the profit margin it did. If BOTA determines that calculation of its own figure is the best figure, then a simple explanation of why it is best should suffice.

B.      *Real Estate Allocation Percentage*

Second, the County argues that BOTA's 25% real estate allocation figure is not supported by substantial competent evidence and is unreasonable, arbitrary, and capricious. Specifically, it argues that the sources Lennhoff relied on do not amount to substantial competent evidence, and it takes issue with the foundation of that evidence presented to BOTA and on which BOTA relied. Kansas Star replies that the County is essentially asking us to reweigh the evidence.

Regarding the real estate allocation percentage figure, BOTA held the following on remand:

> "To determine his real estate allocation percentage, [Jortberg] estimated the real estate allocation percentage at 47%, with a range of 32% to 67%, based on his review of financials of seven publicly traded casinos. [Jortberg] noted that the more successful the casino company, the lower the real estate allocation. Lennhoff examined eight casino sales (25% real estate allocation percentage), various racetrack sales without flagship races (25% real estate allocation percentage), and a casino study by William Kinnard (20% real estate allocation percentage).

"In regard to the determination of total enterprise value attributable to the real estate, Lennhoff's 25% real property allocation yielded from his examination of recent Casino sales is deemed the best evidence presented. The real estate allocation percentage data collected by the parties' experts was derived from casinos in competitive (non-monopoly) markets where there is no excess intangible value in the casino license, as the subject property. Accordingly, for these comparables, it can be generally assumed that a greater percentage of the overall enterprise value is attributable to the real estate component. It would be expected that the subject casino, which is undisputedly a successful gaming enterprise with greater than typical casino profit margins operating in a monopoly market, would have a real estate allocation percentage towards the lower end of this range. After review of the real estate allocation percentage data in the record, the Board finds the 47% real estate allocation percentage sponsored by [Jortberg] is in error and the substantial credible evidence supports the 25% real estate allocation percentage sponsored by Lennhoff."

Unlike its determination of the profit margin figure, here BOTA supplied rationale for its selection of the 25% real estate allocation percentage sponsored by Lennhoff. It deemed it "the best evidence presented" because Lennhoff's figure used data that excluded any additional intangible benefit Kansas Star receives from operating in a monopoly market, Jortberg's allocation percentage was incorrect, and "substantial *credible* evidence supports the 25% real estate allocation percentage sponsored by Lennhoff." (Emphasis added.) Such finding and explanation, albeit simple, makes it clear why BOTA selected the figure of 25%, and that the figure is supported by substantial competent evidence.

The County's argument calls upon us to reweigh the evidence and assess the credibility of witnesses, something which we are not permitted to do. See *Redd*, 291 Kan. at 183-84; *In re Tax Appeal of Colorado Interstate Gas Co.*, 276 Kan. 672, 692, 79 P.3d 770 (2003). BOTA properly performed its fact-finding role and communicated its credibility and weightiness conclusions to this court.

We affirm BOTA's selection of 25% as the figure for the real estate allocation percentage.

II.     IS BOTA'S VALUATION USING THE COST APPROACH ON REMAND FOR TAX YEAR 2015 CORRECT?

Next, the County argues that BOTA's cost analysis on remand for tax year 2015 is still not compliant with USPAP, is still unsupported by substantial evidence, and is arbitrary and capricious. Specifically, the County argues that, as a matter of law, Kansas Star suffers from no superadequacy, which would contribute to a functional obsolescence of the arena, because KELA requires Kansas Star's arena. Accordingly, the County asserts this issue should be reversed and remanded again for revaluation of the property. Kansas Star argues in response that BOTA correctly valued the property for tax year 2015 because BOTA's decision is supported by substantial competent evidence and it applied the five-step USPAP functional obsolescence calculation approved by the prior panel of this court. Kansas Star counters that the County over conflates KELA and Kansas Star's management contract.

A refresher of what exactly the panel instructed BOTA to do on remand is helpful:

"BOTA's conclusion that Jackson's 52% economic obsolescence figure should be reduced by one-third is not supported by evidence that is substantial when considering the record as a whole. Further, BOTA misapplied the law when it failed to comply with USPAP in calculating functional obsolescence. Because of these errors, BOTA's decision was unreasonable, arbitrary, and capricious and must be reversed. The parties provide extensive support for their competing positions in their briefs and ask us to adopt their position on functional obsolescence; however, it is not our role to calculate functional obsolescence. Rather, remand to BOTA for further proceedings is appropriate. Given the opposite conclusions each side advocates and BOTA's attempt to choose a middle ground, we emphasize that our holding does not compel BOTA to adopt one of the

33

party's positions and that a figure somewhere in between 100 percent and 0 percent might be supported by the record in this case. On remand, BOTA would have to explain its rationale for supporting a figure in between the parties' positions; it would have to point to evidence in the record supporting its figure; and its rationale would have to be USPAP compliant." *In re 2015 Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at *16.

Additionally, the panel identified the five-part functional obsolescence procedure under a USPAP-compliant method for calculating functional obsolescence:

"In calculating depreciation for functional obsolescence, the Appraisal Institute provides a five-step formula: (1) identify the cost of the existing item; (2) deduct depreciation previously charged; (3) if functional obsolescence is curable, add up all of the costs associated with curing the item, and if incurable, add value of the loss; (4) if curable, subtract cost of the proper item if included in new construction, and if incurable, subtract depreciated cost of the proper item if included in new construction; (5) add up all the entries to derive the total functional obsolescence attributable to each factor. The Appraisal of Real Estate, Appraisal Institute, 627 (14th ed. 2013)." 2018 WL 3486173, at *15.

On remand, BOTA once again determined that the property suffered from superadequacy and functional obsolescence based upon the uncontroverted evidence that the arena and conference center generated net profit losses to the overall operation. BOTA was not persuaded that the property's only legally permissible configuration of the property was as it was currently comprised with the arena. It found the more credible evidence indicated the arena was not required under KELA and found substantial credible evidence established that the ancillary facilities suffered from substantial functional and external obsolescence. BOTA then adopted Jackson's calculation for the valuation of the property. While BOTA did not walk through each step as laid out in the Bliss appraisal, it is explicit that Jackson's calculation was the calculation BOTA was adopting.

34

First, the depreciation for functional obsolescence was calculated using the five-step USPAP-compliant approach endorsed by the prior panel. Under step 1, the estimated cost of the property was determined to be $70,317,359. This figure was derived from the combined costs of "Phase 1A—Currently Existing" and "Phase 2," less utilities and paving necessary to support the permanent casino. Under step 2, BOTA subtracted the depreciation previously charged of 4%, leading to a $2,812,694 reduction from the cost of the property. Steps 3 and 4 were deemed to be inapplicable because there was no cure, loss, new construction, or deprecation of new items to be considered at that time. Step 5 is the final calculation, which derived a depreciation for functional obsolescence of $67,504,665.

BOTA then determined the fair market value using the cost approach. It added the land value with the replacement costs then subtracted the physical deterioration (assessed at 4%) and functional obsolescence to derive the fair market value. This calculation is best depicted in a table.

| Input category | Figure |
|---|---|
| Land value | $10,100,000 |
| + replacement cost (new) | $146,126,757 |
| - physical deterioration (4%) | $5,845,070 |
| - functional obsolescence | $67,504,665 |
| = fair market value | $82,877,022 |
| Rounded final valuation | $82,900,000 |

The County offers us the same arguments it presented before BOTA, which BOTA found uncredible and/or without merit. The County's entire argument is based on the premise that Kansas Star's management contract is a land use restriction and, therefore, the management contract must be considered when valuing the property. For

reasons we will explain, BOTA's valuation of the property for the 2015 tax year is supported by substantial evidence.

First, the County argues that commercial gaming is only legal in Kansas in accordance with KELA. The County is correct on this point. KELA permits the Kansas Lottery to operate a single casino in each of the State's four gaming zones, and that is the only gaming permitted. See K.S.A. 74-8734; see also *In re Tax Appeal of BHCMC*, 307 Kan. 154, 158, 408 P.3d 103 (2017) ("In order for casino gambling to be legal, a casino must be owned and operated by the State of Kansas.").

Second, the County argues KELA only permits commercial gaming in accordance with the management contract between the State and the gaming operator and that Kansas Star's management contract required all of its ancillary facilities to be built and maintained.

K.S.A. 74-8734(h) outlines provisions required to be included in any management contract with the State for commercial gaming; one of these requirements is that all management contracts incorporate terms and conditions for "ancillary lottery gaming facility operations." K.S.A. 74-8734(h)(7). "Ancillary lottery gaming facility operations" are "additional non-lottery facility game products and services . . . [which] may include, but are not limited to, restaurants, hotels, motels, museums or entertainment facilities." K.S.A. 74-8702(a). Obviously, Kansas Star's arena, equine pavilion, and conference center qualify as "ancillary lottery gaming facility operations," and the County concedes that even without those facilities Kansas Star's hotel, restaurants, and bars would satisfy this definition as well.

The County correctly asserts that the management contract between the State and Peninsula (Kansas Star's original owner) required the ancillary facilities that were constructed. "Kansas Star voluntarily included an arena in its bid [for the management

contract] and, by doing so, became contractually obligated to build and operate the arena." *In re 2014 Equalization Appeal of Kansas Star Casino*, 2018 WL 2749734, at *15. Thus, "the removal of the arena at the casino would result in Kansas Star being in noncompliance with KELA and the management contract, placing its gaming license at risk." 2018 WL 2749734, at *15. As summarized correctly by the County here: "Gaming is unlawful, unless conducted in accordance with KELA. KELA permits Kansas Star to operate the State's facility, but only in accordance with the management contract. The management contract undisputedly required the specific ancillary facilities at issue here to be built and maintained."

But the County's logic begins to falter with its next argument.

Third, the County argues KELA and the management contract cannot be ignored under a USPAP-compliant highest and best use analysis. The prior panel remanded the matter to BOTA to determine whether, and to what extent, Kansas Star's ancillary facilities are functionally obsolete. *In re 2015 Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at *16.

"Functional obsolescence is caused by a flaw in the structure, materials, or design of an improvement when the improvement is compared with the highest and best use of the most cost-effective functional design requirements at the time of the appraisal." The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013). Functional obsolescence can take two forms: functional inadequacy and functional superadequacy. Functional inadequacy, which is not a consideration in the case at hand, is a deficiency in the structure, materials, or design of an improvement, such as too few bathrooms in a residence or low warehouse ceiling heights. The Appraisal of Real Estate, Appraisal Institute, 623, 628. Functional superadequacy, which is at issue here, is "some aspect of the subject property [that] exceeds market norms" or special features built to the owner's specifications that "would not appeal to the market in general," such as an expensive in-

37

ground swimming pool in a low income neighborhood or a warehouse building with excess office space. The Appraisal of Real Estate, Appraisal Institute, 623, 630-31.

> "A superadequacy is a type of functional obsolescence caused by something in the subject property that exceeds market requirements but does not contribute to value an amount equal to its cost. The superadequacy may have a cost to carry (i.e. higher operating costs) that must be considered. A superadequacy is only curable if it can be removed and value is added (or costs reduced) to the property . . . by its removal." The Appraisal of Real Estate, Appraisal Institute, 624.

Analyzing functional obsolescence, including superadequacy, requires appraisers to identify flaws in the improvements as they compare to the property's "highest and best use." The Appraisal of Real Estate, Appraisal Institute, 623. Thus, to correctly analyze functional obsolescence, the property's highest and best use must first be determined. The Appraisal of Real Estate, Appraisal Institute, 623.

A property's highest and best use is the "reasonably probable use of property that results in the highest value." The Appraisal of Real Estate, Appraisal Institute, 332. To be reasonably probable, a proposed use must satisfy three conditions: (1) physical possibility; (2) legal permissibility; and (3) financial feasibility. Uses that do not meet these criteria are eliminated from consideration. Uses that do meet all three criteria are compared for utility, with the use that produces the highest value being declared the highest and best use. The Appraisal of Real Estate, Appraisal Institute, 332.

A legally permissible use must "conform to the land's current zoning classification and local building codes along with any other relevant regulatory or contractual restrictions on land use." The Appraisal of Real Estate, Appraisal Institute, 334. This criterion is the crux of the ongoing disagreement between the County and Kansas Star. The County argues that the management contract is a contractual land use restriction and, therefore, *must* be included in the assessment if the arena is superadequate. Kansas Star

argues the management contract is not part of the real estate, nor is the contract itself a land use restriction and, therefore, it is not required to be considered when determining the arena's superadequacy. By adopting the Bliss appraisal as credible, BOTA implicitly concluded that the highest and best use of the property was—as stated in the Bliss appraisal conclusion—"the development of a casino gaming facility that is appropriately sized and designed to meet the demand of the market, in order to maximize gaming associated revenues, while minimizing capital investment." The record supports Kansas Star's argument.

Preliminarily, it is important to note that such a conclusion is not to say that a management contract *cannot* be considered in valuing the property. In fact, another panel of this court has held that, although not property, the management contract may influence the property's value. See *In re 2013 Equalization Appeal of Kansas Star Casino*, 2018 WL 2748748, at *13. However, the County argues that the contract must be considered. This distinction—*may* be considered versus *must* be considered—does not appear to have been squarely addressed in any of the numerous opinions our court has issued in the saga of the Kansas Star tax appeals. This distinction is tedious but determinative of the outcome here. Ultimately, the County's proposed conclusion is not borne out of the relevant authority.

The County overly equates KELA and Kansas Star's personal management contract. Kansas Star does not dispute that KELA is a land use restriction that applies to all land used for a casino. But the management contract is a *personal* contractual agreement between Kansas Star and the State to operate a casino. KELA provides that the management contract is not a land use restriction, as it "*shall not constitute property*, nor shall it be subject to attachment, garnishment or execution, nor shall it be alienable or transferable, except upon approval by the executive director, nor shall it be subject to being encumbered or hypothecated." (Emphasis added.) K.S.A. 74-8734(m).

39

Kansas law has long held that personal contractual obligations are not part of the fee simple interest in real estate to be valued for ad valorem tax purposes. As discussed, Kansas valuation statutes do not use the term "fee simple." Nevertheless, Kansas ad valorem valuation contemplates valuation of the fee simple interest. See *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d at 337-40. K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value. In turn, K.S.A. 79-503a defines "fair market value" as "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for *property* in an *open and competitive market*, assuming that the parties are acting without undue compulsion." (Emphases added.) "It is clear, therefore, that the fair market value statute values property rights, not contract rights." *Prieb Properties*, 47 Kan. App. 2d at 131.

Additionally, Kansas Star's casino management contract has been excluded as property by another panel of this court. See *In re 2013 Equalization Appeal of Kansas Star Casino*, 2018 WL 2748748, at *13 (noting "the management contract itself is not property," although it may influence the value of real estate). The fact that a management contract can influence the value of real estate does not mean that the real estate improvements cannot suffer from obsolescence. And the County provides no support for a different conclusion. Here, the fact-finder found Kansas Star's management contract did affect the value of the real estate—in a negative way, because the arena was superadequate.

Viewing the County's argument practically, it asserts that the management contract via KELA, which is a land use restriction, allowed construction of the property. But this argument, when broken down, is not entirely correct. It is correct that the management contract via KELA permits gaming on the property. However, KELA does not demand that the property only ever be used for gaming. The management contract does not run with the land; it is an agreement between the State and Kansas Star. If Kansas Star were

to sell the property, the contract would not follow it. As discussed, the ad valorem valuation assumes a hypothetical sale of the subject property on January 1. Assuming Kansas Star sold the property on January 1, 2015, its contractual right to operate the casino would *not* automatically pass with the sale of the property. True land use restrictions are like a piece of the twine holding a bundle of sticks together—the restriction dictates what kind of sticks will fit in the bundle and holds the sticks together, passing with the sticks themselves. The buyer of the property at issue here would be free to do with that property as it wished, so long as it was legally permissible. The *management contract* is what makes gambling legally permissible at the subject property, not KELA, and that management contract does not run with the land. See K.S.A. 74-8734(m).

Kansas Star's owner could have built the facility to the exact specifications the property currently possesses even without the management contract. It is not the contract that allowed the casino to be constructed. Rather, the contract allows gambling to take place inside of the building; it has no bearing on the permissibility of the actual construction of the building. It is true that for Kansas Star's owner to be awarded the contract, Kansas Star Casino had to be built in accordance with that contract, but the contract only permits gambling inside of the building; it did not address construction of the building itself. Stated differently, the contract did not give permission to build—it gives permission to run a casino in the building so long as the terms of the contract are followed, with one of those terms being construction of the ancillary gaming facilities. Practically speaking, a reasonably prudent person would not build a multimillion dollar facility such as the Kansas Star facilities without having secured such a contract, but just because such a person *would* not build a facility does not mean he or she *could* not.

Additionally, KELA simply requires a management contract. K.S.A. 74-8734(f). It does not require that the south central gaming facility be built just as the specifics of

41

Kansas Star's management contract require. The County acknowledged this as true in its brief:

> "In its order on remand, BOTA concluded the management contract should be treated like a lease, that is, the appraisers should acknowledge *a* management contract is necessary to legally operate a casino, but should not consider the specific requirements *the* management contract imposes on Kansas Star in order for it to legally operate. This conclusion rests, in part, on the notion that the text of KELA itself does not specify that any specific ancillary amenity be included in the management contract. **While, strictly speaking, this is true**, the reality is that over the course of three separate rounds of competitive bidding for the south central management contract, the Kansas Lottery approved six prospective contracts. Every single contract included a separate arena/event space. Thus, the suggestion that KELA did not 'require' separate ancillary facilities be included in the competitive bids does not mirror reality."

An arena simply is not required under the text of KELA. See K.S.A. 74-8702(a) ("'Ancillary lottery gaming facility operations' means additional non-lottery facility game products and services not owned and operated by the state which *may* be included in the overall development associated with the lottery gaming facility. Such operations may include, but are not limited to, restaurants, hotels, motels, museums or entertainment facilities." [Emphasis added.]). Even without the consideration of the arena, Kansas Star meets the definition with its hotel, bars, and restaurants. Looking outside of Kansas Star's situation, it is clear KELA does not require an arena. Hollywood Casino, the gaming facility in the northeast gaming zone, is an "approximately 245,000-square foot building [that] includes a Las Vegas-style casino with a 94,444-square foot gaming floor; a steak house, buffet, sports bar, mid-level restaurant, coffee shop, and VIP lounge; office and administrative space; 1,253 covered parking spaces; and additional surface parking." *In re Kansas Entertainment*, 2018 WL 6713975, at *2. Notably, that KELA-approved casino does not have an arena. If such an ancillary gaming facility were truly a requirement of KELA, Hollywood Casino would not be in operation.

To counter these considerations, the County cites to K.S.A. 79-503a, which requires "other factors" be used when assessing fair market value. One of those factors is

> "restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended." K.S.A. 79-503a(j).

The County's argument overlooks the phrase "imposed upon the use of real estate." It is not disputed that government requirements and regulations are part of the fee simple estate. The plain text of this provision does not require that private government contracts be considered as part of the fee simple interest in real estate. But see *In re Equalization Appeal of Ottawa Housing Ass'n*, 27 Kan. App. 2d 1008, Syl. ¶ 7, 10 P.3d 777 (2000) ("Taxing authorities should consider the effects of low-income housing contracts when valuing property for ad valorem taxes."). The management contract here was awarded, not imposed, and it is not a restriction or a requirement imposed on the land or any subsequent owner. By contrast, low-income housing contracts are recorded, run with the land, and bind future owners. *In re Equalization of Paola-Sundance Apartments*, No. 2004-8772-EQ, at *1 (Kan. Bd. Tax. App. 2006). The management contract is the vehicle by which Kansas Star is *permitted* to use the real estate for its gaming operations. It is not a restriction on all possible uses of the land and improvements thereto in and of itself. The contract is a personal obligation, not a consideration of the property.

Essentially, the County argues that the ancillary gaming facilities can never be deemed superadequate as a matter of law. But superadequacy is a question of fact, and "our job is not to make a factual determination of the value . . . . That task is for BOTA." *In re Equalization Appeal of Andover Antique Mall, L.L.C.*, 33 Kan. App. 2d 199, 209, 99 P.3d 1117 (2004).

43

With all these considerations in mind, we conclude that while BOTA *may* consider the management contract in valuing the property at issue here, it is not required to do so. The County's argument that BOTA's decision on remand ignores the requirements of the management contract, in violation of USPAP and Kansas law, is unpersuasive, especially because BOTA applied the USPAP-compliant method of calculating depreciation for functional obsolescence endorsed by the previous panel.

We now review BOTA's valuation for substantial competent evidence. As previously stated, in applying Jackson's calculation, BOTA found:

"While the subject ancillary facilities were constructed to comply with the management contract and KELA, the Board has not been persuaded that the subject property, as currently comprised, is the only legally permissible configuration of the property as argued by the County. As such, the County's argument that the existing ancillary improvements are legally required and, therefore, the subject property suffers from no functional or external obsolescence is not supported. Moreover, the Board finds now, as in our original decision on these matters, that the substantial credible evidence indicates that the ancillary facilities suffer from substantial functional and external obsolescence. Based thereon, the Board finds that the cost approach analysis and functional/external obsolescence determination sponsored by the Taxpayer's expert is the best indicator of value. Therefore, the subject property's 2015 appraised value is $82,900,000 as recommended by the Taxpayer at the remand hearing."

It is the role of BOTA to assess the credibility of evidence. Appellate "[c]ourts may not reweigh the facts but rather must examine the record before BOTA to determine if substantial evidence exists to support its findings, accepting as true the evidence and all inferences to be drawn from the evidence which support BOTA's findings." 33 Kan. App. 2d 199, Syl. ¶ 3.

Accepting the evidence relied on by BOTA as true, a review of the Bliss appraisal clearly supports BOTA's conclusion that the ancillary gaming facilities were superadequate. Thus, we affirm BOTA's valuation of the property for the 2015 tax year.

III.   CONCLUSION

For the 2014 tax year, we reverse BOTA's adoption of a profit margin figure of 23.1% because it did not adequately explain why it adopted this percentage. Although such a figure may be adequately supported by the evidence, the lack of an explanation precludes judicial review. As a simple explanation should suffice, we remand this issue to BOTA so it may explain its rationale for adopting a profit margin figure of 23.1%. We affirm BOTA's real estate allocation percentage figure of 25% as it is supported by evidence contained in the record as a whole.

For the 2015 tax year, we affirm BOTA's valuation of the property in all respects.

Affirmed in part, reversed in part, and remanded with directions.